**Samuel R. DICKEY**

v.

**CBS, INC.**

**Civ. A. No. 74–1867.**

United States District Court, E. D. Pennsylvania.

Oct. 31, 1977.

See also: D.C., 387 F.Supp. 1332.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McGLYNN, District Judge.

This is an action for libel resulting from statements made by an incumbent U. S. Representative during the course of a primary political campaign in 1974 which were aired by the defendant on a public affairs television program called "Update".

That the statements were defamatory and false is not disputed, but because the plaintiff is admittedly a public figure, the issue to be decided is whether plaintiff has proved by clear and convincing evidence that the defamatory communication was published with "actual malice, that is, with knowledge that it was false or with reckless disregard as to whether it was false or not." *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

After hearing the evidence and upon consideration of the briefs and arguments of counsel, the court makes the following

## FINDINGS OF FACT

1. Plaintiff, Samuel R. Dickey ("Dickey") is a citizen of Pennsylvania.

2. CBS is a New York corporation having its principal place of business at New York, New York.

3. The matter in controversy exceeds, exclusive of interest and costs, the sum of $10,000.

4. The defendant, CBS, owns and operates the television station WCAU–TV, Channel 10 which telecasts throughout the metropolitan area of Philadelphia, Pennsylvania and surrounding counties, including Delaware County.

5. On May 5, 1974, CBS broadcast over Channel 10 a program called the "Update Show" on which the candidates for the Republican nomination for the United States House of Representatives for the Seventh Congressional District were interviewed by John Facenda and Dan Cryor, news reporters on the staff of Channel 10. The candidates who participated in the program were Congressman Lawrence G. Williams, the incumbent, Stephen J. McEwen, Esquire, the District Attorney of Delaware County, and Arnold A. Barnaby, Esquire. Both Williams and McEwen held their respective offices for approximately eight years.

6. The Update Show of May 5, 1974, had been recorded on videotape in the studio of Channel 10 during the evening of Wednesday, May 1, 1974.

7. In the course of the Update Show of May 5, 1974, Congressman Williams, as part of his response to a question from Dan Cryor soliciting his views on inflation, made the following statement which plaintiff claims to be actionable:

". . . In addition to that, we've had a report prepared by Delaware County tax money, commonly referred to as the Sprague Report, when it should be referred to as the McEwen Report, because this report was bought and paid for by the tax dollars of the people of Delaware County. Now in this report and in the preliminary informational reports appears the information that Phil Toanone made a $25,000 payoff. In the same information a $55,000 payoff was made by the, for the Barclay Square Apartments; and a $20,000 payoff for the Bishop Hill Apartments, and I could go on and on. Now this information has been available to our District Attorney, who says he's not going to go on the War Board. Of course he's not. He lives in Upper Darby and Upper Darby is represented on the War Board by Sam Dickey, to whom these payments have been made. And in spite of the fact that these preliminary informational reports were finished in early, early 1973, some people would have us believe that no final report has been prepared. Now, I say if anybody's going to deny that and try to cover this stuff up, then these reports should be turned over to the Attorney General of the State of Pennsylvania, to be reviewed by him along with the investigators employed by Delaware County for Sprague, as well as the members of the CID, the investigators of the CID, who participated in the preparation of this report."

8. Immediately following the quoted remarks of Congressman Williams, the following was said by Messrs. Facenda and McEwen:

"MR. FACENDA: I wanted to ask that question of Mr. McEwen. Sprague hasn't yet made public that particular report, and why hasn't he, and do you intend to, well, is that normal procedure, let me put it that way.

"MR. McEWEN: Well, John, there is no report. Mr. Williams was invited, in fact he set the time and place in my office last Wednesday, a week ago today, and Mr. Sprague appeared, I appeared, Mr. Williams did not. Mr. Sprague in a conference with the press made perfectly clear at that time that there is no report, that he would expect the report to be ready mid-summer. As far as the reasons why, I guess they would rather, they, they would be more appropriately addressed to Mr. Sprague himself. He indicated at that time, however, he had other matters that required his attention, such as the conviction of the ten or so defendants of murder, including Mr. Boyle more recently in the Delaware County courts, so that Mr. Sprague was

brought in 1971 as an independent investigator, as an independent prosecutor, and that concept began in Delaware County so the people of the County could have confidence in the District Attorney's office. Mr. Williams' charges about reports that I have and Mr. Sprague has is just incorrect. There is no such report. And that's that. Now you can take the word of Mr. Sprague or Mr. Williams, and I'll ride any time with Mr. Sprague, that's for sure.

9. On the 7 P.M. news show of May 5, 1974, Channel 10 broadcast a news item concerning Congressman Williams' charges in which Williams' remarks on the Update Show were shown on videotape, following which Alvin S. Ackerman, Esquire, Dickey's attorney ("Ackerman"), appeared live and denied the truthfulness of what Williams had said about Dickey.

"MR. ROSELLE: Good evening from the newsroom. I'm Bert Roselle. Here's what's going on. Corruption charges in Delaware County. Incumbent Republican Congressman Lawrence Williams and the two Republicans who want his job are our guests of Update today. Williams lost the County organization support earlier this year to District Attorney Stephen McEwen. Today, Williams charged wide-spread macing in Delaware County: called McEwen a do-nothing part-time District Attorney; then dropped a bombshell:

"MR. WILLIAMS: We've had a report prepared by Delaware County tax money, commonly referred to as the Sprague Report when it should be referred to as the McEwen Report, because this report was bought and paid for by the tax dollars of the people of Delaware County. Now in this report and in the preliminary informational reports appears the information that Phil Toanone made a $25,000. payoff. In the same information a $55,000. payoff was made by the, for the Barclay Square Apartments; and a $20,000. payoff for the Bishop Hill Apartments, and I could go on and on. Now this information has been available to our District Attorney,

who says he's not going to go on the War Board. Of course, he's not. He lives in Upper Darby and Upper Darby is represented on the War Board by Sam Dickey, to whom these payments have been made. And in spite of the fact that these preliminary informational reports were finished in early, early 1973, some people would have us believe that no final report has been prepared. Now, I say if anybody's going to deny that and try to cover this stuff up, then these reports should be turned over to the Attorney General of the State of Pennsylvania, to be reviewed by him along with the investigators employed by Delaware County for Sprague, as well as the members of the CID, the investigators of the CID, who participated in the preparation of this report.

"MR. ROSELLE: McEwen challenged Williams. He said the report in question won't be ready till midsummer, but right now no such report exists. Delaware County Supervisor Samuel Dickey is not feeling well. Here to answer Williams' charges that Dickey took payoffs is Alvin Ackerman, Mr. Dickey, Mr. Dickey's attorney Mr. Ackerman, how do you respond to those allegations?

"MR. ACKERMAN: Bert, I . . . I, I, I, I'm just absolutely amazed and shocked that a man who's a Congressman of the United States, elected by the people of Delaware County, could make such irresponsible statements on television or even in private. First of all, Mr. Williams knows perfectly well that there is no Sprague report. Mr. Sprague has told him that. It's been published in the newspapers; it's been on television. Yet he refers to a Sprague report and says that that report says that Mr. Dickey took payoffs. Now, I've talked with Mr. Dickey about this. He absolutely denies that any payoffs were ever taken, that any payoffs were offered, or that any payoffs were given. This matter was investigated fully, Bert, by the Pennsylvania Crime Commission and by Mr. Sprague and his investigators. You know, when a Congressman comes along

and says that these payoffs were made to Samuel R. Dickey, I, I think he must know that he libeled Mr. Dickey, told a complete and utter falsehood. Mr. McEwen during the course of the program, and I watched it, talked in terms of the Congressman being mistaken. I have to go much further than that. Mistaken is just too kind a word. These were falsehoods; Mr. Williams knows they're falsehoods; and it's Mr. Dickey's intention and he's instructed me to file suit for libel, which I intend to do the very first thing Monday, Monday morning. We would hope that Mr. Williams will cooperate and come forth quickly so that we may take his deposition so that the people of Delaware County and elsewhere may find, just as we have, that there is absolutely nothing to the charges that he's made. I do want to say one other thing  .  .  .

"MR. ROSELLE: We're just about out of time. So please wrap it up very quickly, if you would.

"MR. ACKERMAN: I want only to comment on the sale of parkland. First of all, it wasn't a sale of parkland. It was a sale of seven-tenths of an acre of a forty-two degrade hill, forty-two degree grade hill, that was strewn with rocks and debris and this sale at the time it was made was approved by the Attorney General of Pennsylvania. Mr. Williams knows this but won't tell it to you.

"MR. ROSELLE: All right, thank you very much, Mr. Ackerman, for taking your time to be with us here in the newsroom on Sunday."

10. On the 11:15 P.M. news show of May 5, 1974, Channel 10 broadcast another news item concerning Congressman Williams' charges in which Williams' statements about Dickey and Ackerman's denials, both of which were on videotape, were presented:

"MR. ROSELLE: Charges of political corruption in Delaware County. County charges; threats of a libel suit; and a challenge to lie detector tests. Incumbent GOP Congressman Lawrence Williams and the two Republicans who want his job appeared on our Update program today. Williams dropped a bomb, and that's where the story begins.

"MR. WILLIAMS: We've had a report prepared by Delaware County tax money, commonly referred to as the Sprague Report when it should be referred to as the McEwen Report, because this report was bought and paid for by the tax dollars of the people of Delaware County. Now in this report and in the preliminary informational reports appears the information that Phil Toanone made a $25,000. payoff. In the same information a $55,000. payoff was made by the, for the Barclay Square Apartments; and a $20,000. payoff for the Bishop Hill Apartments, and I could go on and on. Now this information has been available to our District Attorney, who says he's not going to go on the War Board. Of course he's not. He lives in Upper Darby and Upper Darby is represented on the War Board by Sam Dickey, to whom these payments have been made. And in spite of the fact that these preliminary informational reports were finished in early, early 1973, some people would have us believe that no final report has been prepared. Now, I say if anybody's going to deny that and try to cover this stuff up, then these reports should be turned over to the Attorney General of the State of Pennsylvania, to be reviewed by him along with the investigators employed by Delaware County for Sprague, as well as the members of the CID, the investigators of the CID, who participated in the preparation of this report.

"MR. ROSELLE: McEwen says that right now no such report exists, that it won't be ready till midsummer. Delaware County Supervisor Samuel Dickey is ill. His attorney, Alvin Ackerman, came to the news room to answer charges that Dickey had taken payoffs.

"MR. ACKERMAN: Bert, I  .  .  . I, I, I, I'm just absolutely amazed and shocked that a man who's a Congressman of the United States, elected by the people of Delaware County, could make such

irresponsible statements on television or even in private. First of all, Mr. Williams knows perfectly well that there is no Sprague report. Mr. Sprague has told him that. It's been published in the newspapers; it's been on television. Yet he refers to a Sprague report and says that that report says that Mr. Dickey took payoffs. Now, I've talked with Mr. Dickey about this. He absolutely denies that any payoffs were ever taken, that any payoffs were offered, or that any payoffs were given.

"MR. ROSELLE: Ackerman says they'll file libel charges against Congressman Williams tomorrow. Williams, meantime, has extended challenges to lie detector tests to Delaware County D. A. Steven McEwen and Philadelphia's First Assistant D. A. Richard Sprague that the report in question has been completed; and to Samuel Dickey that he did take alleged payoffs. More from the news room right after this time out."

11. On the 6 P.M. news show of May 6, 1974, Channel 10 broadcast a brief report of Dickey's announcement that he intended to sue Congressman Williams for libel, in the course of which Williams' charges and Dickey's denial were referred to in summary fashion:

"MR. TUCK: The man who runs the so-called political 'War Board' in Delaware County, William Dickey (sic Samuel Dickey), says he is suing Congressman Lawrence Williams for libel. Williams yesterday, here on Channel Ten, charged Dickey has taken at least a hundred thousand dollars in kickbacks. Dickey of course says that's a lie. Williams also says Philadelphia Assistant District Attorney Dick Sprague has a report that will back his charge up, but Sprague says there is no such report. Williams wants everybody concerned to take a lie detector test, including Delaware County D. A. Steven McEwen, Williams' opponent in the Republican primary. Sprague, Dickey and McEwen all said today that lie detector thing is just a big political trick—they won't take it.

12. On May 2, 1974, three days prior to the telecast, Ackerman telephoned Channel 10 and spoke with Messrs. Melvin Levine, Director of Technical Operations and Administration, and John L. Essig, News Operations Manager, of the station. In the course of those conversations, Ackerman told Messrs. Levine and Essig that Dickey denied Congressman Williams' charges; that such charges were false and defamatory; and requested that the airing of the Update Show taped on May 1, 1974, be deferred pending further investigation to determine whether Williams' statements were probably true or probably false.

13. On May 3, 1974, Ackerman delivered letters by messenger to the offices of Messrs. Levine and Essig, repeating the substance of his telephone conversations with them of May 2, 1974 as follows:

"Dear Mr. Levine:

In accordance with our telephone conversation yesterday, I wish to confirm that I represent Mr. Samuel R. Dickey. As I told you during that telephone conversation, it is my understanding that WCAU–TV intends to telecast a pre-recorded interview with Congressman Lawrence Williams on its 'Update' program scheduled Sunday, May 5, 1974. It is further my understanding that false and defamatory accusations against my client were made during the course of this interview and will be further published by the aforementioned telecast. I asked that you withhold the showing of this program pending an investigation of the accusations which, I am certain, you will then find are completely false.

When I called your office late yesterday afternoon to determine what decision, if any, you had made with respect to my client's request, I was referred to Mr. Jack Essig who advised me that he had been made aware of the objection I raised and that a copy of the tape was being forwarded to your legal department for an opinion but that it was still the intention of WCAU–TV to telecast the program as scheduled.

I submit that the airing of this program would be completely irresponsible and result in great damage to Mr. Dickey's reputation. I once again insist that you not further aid those who would falsely vilify Mr. Dickey by an additional publication of these libelous statements. Should you persist in your attempts to do so you may be assured that Mr. Dickey will pursue all legal remedies that are available to him to their fullest extent.

Very truly yours,
ALVIN S. ACKERMAN

14. On May 2, 1974, Dan Cryor informed Robert Morse ("Morse"), the News Director of Channel 10, that Congressman Williams had made some very serious charges during the taping of the Update Show the previous evening.

15. Morse was the executive at Channel 10 who had the responsibility for making the decision whether to air the Update Show.

16. Following his conversation with Cryor, Morse reviewed audio and video tapes of the Update Show; assigned Bill Baldini, a reporter on the staff of the station ("Baldini"), to follow up on what Williams had said and discussed with him how to handle getting the other side on the air. He also discussed the matter with CBS corporate counsel in New York City.

17. In his initial meeting with Baldini, who was a resident of Delaware County and was familiar with its political situation, Morse instructed Baldini to communicate with Dickey to get his reaction to Williams' charges and to interview Williams and get from him as much information as he could to substantiate what he had said, including a copy of the Sprague report, if possible. Morse and Baldini also discussed in general terms continued allegations of corruption in Delaware County.

18. During this conversation, Baldini expressed the opinion that Congressman Williams was in a tight race. However, Morse, an experienced political reporter himself, formed his own opinion that Williams would be elected because he had the advantages resulting from his being a four-term incumbent.

19. Baldini attempted to contact Dickey, Harry McNichol, the Chairman of the War Board, and Ackerman by telephone but none of those persons returned Baldini's calls.

20. Baldini was aware prior to his interview with Williams of May 2, 1974 that Williams had, on the Update Program, said that the charges he made were contained in the Sprague report. Baldini considered the Sprague report, its existence or nonexistence, critical in determining the truth or falsity of Williams' charges concerning the plaintiff. During the interview, Baldini asked Williams to either give him a copy of the Sprague report or let him see a copy of the report and Williams refused to do either. Baldini asked Williams for the names of the informants who allegedly provided him with the Sprague report and the information which formed the basis for his charges but Williams refused to reveal those names. During the interview, Williams would only repeat the charges he had made against the plaintiff; he offered Baldini no corroborating information of any kind.

21. Representative Williams also told Baldini that as the result of his having been a member of the War Board for a number of years, he had a lot of information based on personal experience, that he was aware of the seriousness of the charges he was making and that he would stake his reputation on the truth of the allegations.

22. At the conclusion of the Williams' interview, Baldini reported back to Morse, the news director, at around 6:00 P.M., Saturday, May 4, 1974, still before the telecast of the Update Program the next morning. At that time, Baldini informed Morse that Williams had only repeated the charges and had provided him (Baldini) with no additional information that would corroborate the charges concerning the plaintiff. Baldini also informed Morse at that time that Williams had refused to give him (Baldini) a copy of the Sprague report or let him (Baldini) read a copy of the report. Baldini

informed Morse during that Saturday evening conversation of the following: that because Williams was on thin ice and stood a chance of losing the election, he (Baldini) viewed the charges made by Williams with a jaundiced eye. Nevertheless, he told Morse that there was a good probability that Williams was telling the truth.

23. In making his decision to broadcast the Update Show, Morse took into account the following factors:

(a) Congressman Williams had come prepared to make the statements he made. His charges were not off-the-cuff responses to any questions asked, but were worked into a response to a question concerning inflation.

(b) Williams was a four-term Congressman and that gave him a great deal of credibility.

(c) While Williams spoke of quoting the Sprague report, he actually waved papers around, which certainly implied that he possessed the report or portions of it and was quoting from it.

(d) Since Williams had been associated with and been supported by the War Board for a great number of years, and was thoroughly familiar with Delaware County politics, it was reasonable to believe he knew whereof he spoke.

(e) The Sprague report's release was indeed anticipated at that point in time and what Sprague said carried weight; therefore Williams' stated source was not a vague unknown one.

(f) Williams' charges were not generalized, but specific, naming names and amounts, indicating real knowledge, not wild charges.

(g) Although sometimes wild charges are made in the heat of debate, this was not the case here because Williams did not back off a bit when Baldini interviewed him two days later in relaxing circumstances at his home.

(h) The charges made by Williams were consistent with on-going news stories over several years concerning alleged corruption in Delaware County politics, including alleged corruption on the part of the War Board and Mr. Dickey.

(i) The Baldini interview.

24. Morse, in deciding to air the charges, also had knowledge:

a. of Baldini's suspicion.

b. That McEwen, who appeared on the program with Williams, was and had been District Attorney of Delaware County for eight (8) years, had denied the existence of the Sprague report during the taping of the Update program, which Morse had viewed and listened to.

c. That Williams, having been involved in Delaware County politics for a long time, had never made these charges previously.

d. That Sprague was a man of considerable reputation and anything he said would carry a substantial amount of weight.

e. That McEwen, during the taping of the Update program, which Morse listened to and viewed prior to telecasting the program, stated that he and Sprague held a press conference to which Williams was invited but did not appear, and that Sprague stated that at that time he had not yet prepared his report of the investigation of Delaware County.

25. Morse had no first hand knowledge or tangible proof of the truth of charges made by Williams.

26. The charges made by Williams on the Update program telecast on WCAU–TV, that Dickey accepted payoffs are not true.

27. Samuel R. Dickey, the plaintiff in this case is seventy-nine (79) years of age.

28. After hearing about the charges made by Williams, Dickey became very depressed and suffered great emotional distress and became very upset. Dickey's grandchildren also heard the charges broadcasted and they asked him about these charges and this also distressed him and greatly upset him.

29. At the time that the program was telecasted on May 5, 1974, Dickey was the Chairman of the Republican Campaign Committee of Upper Darby Township. At

this same time, he was also a member of the Republican Board of Supervisors for Delaware County, (War Board) representing Upper Darby Township and Millbourne.

30. Dickey received a salary of Five Thousand ($5,000.00) Dollars per year as Chairman of the Republican Campaign Committee of Upper Darby.

31. As a result of the telecast of the Update program on May 5, 1974, Dickey resigned as Chairman of the Republican Campaign Committee of Upper Darby Township and resigned from his position as a member of the Republican Board of Supervisors of Delaware County, because of the embarrassment and humiliation that he and his family were subjected to.

32a. The charges made by Williams were understood by Dickey to accuse him, Samuel R. Dickey, of the commission of criminal offenses.

32b. The Pennsylvania crimes code, effective June 6, 1973, provides in Sections 18 P.S. 4701 and 1103:

§ 4701 Bribery in Official and Political Matters

(a) Offenses defined—A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

1. any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official or voter by the recipient;

2. any benefit as consideration for the decision, vote, recommendation or other exercise of official discretion by the recipient in a judicial, administrative or legislative proceeding; or

3. any benefit as consideration for a violation of a known legal duty as public servant or party official.

(b) Defenses prohibited—It is no defense to prosecution under this section that a person whom the actor sought to influence was not qualified to act in the desired way whether because he had not yet assumed office, had left office, or lacked jurisdiction, or for any other reason.

§ 1103 Sentence of Imprisonment for Felony

A person who has been convicted of a felony may be sentenced to imprisonment as follows:

1. . . .

2. . . .

3. In the case of a felony of the third degree, for a term which shall be fixed by the court at not more than seven years.

33. John McNichol (McNichol) who resides at 500 Kenwood Road, Drexel Hill, Pennsylvania, is the son-in-law of the plaintiff.

34. The plaintiff resides at this same address with McNichol, his wife, who is the plaintiff's adoptive daughter, and his grandchildren.

35. On May 5, 1974, McNichol viewed the Update program telecast on WCAU–TV, Channel 10 and in listening to the telecast, understood Williams to say that the plaintiff had accepted payoffs.

36. McNichol also viewed the defendant's 7:00 p. m. and 11:15 p. m. regularly scheduled newscast of May 5, 1974 and the 6:00 p. m. regularly scheduled newscast of May 6, 1974, wherein the statements of Williams, charging the plaintiff with the receipt of payoffs, were repeated.

37. There are two other VHF stations in the Philadelphia metropolitan area, Channel 3 (NBC) and Channel 6 (ABC), and neither station made mention of the charges made by Williams.

38. There are two major daily newspapers that cover the entire Delaware Valley, the Philadelphia Evening Bulletin and the Philadelphia Inquirer and neither one of these two newspapers mentioned the charges made by Williams.

39. There are two local newspapers in the Delaware County area, a weekly, the News of Delaware County, and a daily, the Delaware County Daily Times and neither of these two newspapers made any mention of the charges made by Williams.

40. On April 24, 1974, there appeared a newspaper article in the Philadelphia Evening Bulletin referring to a news conference held by Williams where he stated

there was some evidence concerning a pay-off for the sale of park land in Upper Darby, but no names were mentioned.

41. In that same newspaper article, it is stated that Richard Sprague (Sprague), the Special Prosecutor in Delaware County, had not yet prepared a report of his investigations in Delaware County.

42. During the Update program telecast on May 5, 1974, McEwen denied that Sprague had, as of that date, prepared his report.

43. The total air time allotted by the defendant to Williams' charges concerning the plaintiff amounted to five and one-half (5½) minutes, while the total air time allotted by the defendant to the plaintiff's rebuttal was three and one-half (3½) minutes.

44. The Update program that was taped on May 1, 1974 and telecast four (4) days later on May 5, 1974 was a documentary or feature-type program rather than live reporting or coverage of a spontaneous newsworthy incident.

## DISCUSSION

As noted at the outset, the crucial issue here is whether the plaintiff has proved by clear and convincing evidence that the defendant published the defamatory statements with actual malice; that is, with knowledge that the statements were false or with reckless disregard of whether or not they were false or not.

In deciding this issue, there are numerous factors which the court can take into consideration. Among these are the pre-publication denial, the fact that the program was a pre-recorded documentary and not "hot news" requiring immediate dissemination and the contraindications raised by the denials of the other participants in the program. Perhaps the most significant aspect is the inadequacy of the investigation conducted by Baldini on instructions from Morse. It strains all credulity to suggest that CBS was interested in determining the truth of the charges when with all the resources at its command, it made no effort whatever to contact Sprague who, according to Williams, was the source of the information. CBS simply ignored McEwen's

statement and made no attempt to verify the existence of the so-called Sprague report. The evidence clearly suggests to me that the efforts orchestrated by Morse were designed not so much to verify Williams' charges as it was to promote and perpetuate a controversy by having the charges repeated in order to induce a response by the "other side". (Baldini took a television crew on his investigation.)

The fact is, and I so find, that CBS, acting through Morse, was not at all concerned with whether or not the charges by Williams were true.

Nevertheless, under the test laid down in *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), "there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Unfortunately for the plaintiff, the evidence is not clear and convincing that CBS entertained serious doubts as to the truth of the charges by Williams. The evidence is only clear and convincing that CBS was indifferent to the truth of the charges.

That a man in the twilight of his life should be subject to a groundless attack on his reputation and integrity with the consequent distress, humiliation and embarrassment to him and his family without any redress seems a very high price to pay compared to the cost of a telephone call to Sprague which would have provided CBS with sufficient information to make a valid judgment as to the truth of Williams' charges. But as the Supreme Court said in *St. Amant v. Thompson*, 390 U.S. at 731, 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267:

It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity. . . . But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones. . . .

Accordingly, the court makes the following:

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and the subject matter.

2. The defendant is entitled to judgment.