**Samuel R. DICKEY, Appellant,**

v.

**CBS INC., Appellee.**

**No. 77–2615.**

United States Court of Appeals,
Third Circuit.

Argued Aug. 8, 1978.

Decided Sept. 12, 1978.

Alvin S. Ackerman, Ackerman & Mylotte, Upper Darby, Pa., for appellant.

George P. Williams, III, Peter S. Greenberg, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellee.

Before ALDISERT, VAN DUSEN and HUNTER, Circuit Judges.

OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This appeal arises from a defamation suit brought by Samuel R. Dickey against CBS Inc. (CBS) for false statements[1] about Dickey made by then Congressman Lawrence G. Williams, and broadcast by CBS's Philadelphia affiliate, WCAU–TV (Channel 10). Sitting without a jury, the trial court held in favor of CBS. 441 F.Supp. 1133 (1977). It ruled that Dickey was a public figure and had failed to prove by clear and

---

1. The district court found that the statements were not true. Finding of Fact No. 26. That finding is not challenged by appellee.

convincing evidence that CBS had acted with actual malice, as required and defined by *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). We affirm.

## FACTS

On May 1, 1974, the candidates for the Republican nomination for United States Representative for the Seventh Congressional District of Pennsylvania videotaped a program for Channel 10 called "Update" which was to be broadcast on May 5. Two of the candidates who appeared on the program were Williams and Stephen J. McEwen, the District Attorney of Delaware County. Although Williams was the incumbent, the Delaware County Republican Board of Supervisors,[2] popularly known as the War Board, had given its endorsement to McEwen.

The candidates were interviewed on "Update" by two Channel 10 reporters, John Facenda and Dan Cryor. After questioning the other candidates on their views about inflation, Cryor asked Williams, "Mr. Congressman . . . inflation?" Williams responded in pertinent part:

> ". . . In addition to that, we've had a report prepared by Delaware County tax money, commonly referred to as the Sprague Report, when it should be referred to as the McEwen Report, because this report was bought and paid for by the tax dollars of the people of Delaware County. Now in this report and in the preliminary informational reports appears the information that Phil Toanone made a \$25,000 payoff. In the same information a \$55,000 payoff was made by the, for the Barclay Square Apartments; and a \$20,000 payoff for the Bishop Hill Apartments, and I could go on and on.

Now this information has been available to our District Attorney, who says he's not going to go on the War Board. Of course he's not. He lives in Upper Darby and Upper Darby is represented on the War Board by *Sam Dickey, to whom these payments have been made.* And in spite of the fact that these preliminary informational reports were finished in early, early 1973, some people would have us believe that no final report has been prepared. Now, I say if anybody's going to deny that and try to cover this stuff up, then these reports should be turned over to the Attorney General of the State of Pennsylvania, to be reviewed by him along with the investigators employed by Delaware County for Sprague, as well as the members of the CID, the investigators of the CID, who participated in the preparation of this report." (emphasis added).

Thus, in response to a question about inflation, Williams charged that the Sprague report[3] accused Dickey, who was a member of the War Board which had endorsed McEwen, of taking payoffs.

Immediately following Williams' statement, the following dialogue between Facenda and McEwen took place:

> Mr. Facenda: I wanted to ask that question of Mr. McEwen. Sprague hasn't yet made public that particular report, and why hasn't he, and do you intend to, well, is that normal procedure, let me put it that way.

> Mr. McEwen: Well, John, there is no report. Mr. Williams was invited, in fact he set the time and place in my office last Wednesday, a week ago today, and Mr. Sprague appeared, I appeared, Mr. Williams did not. Mr. Sprague in a conference with the press made perfectly clear at that time that there is no report, that he would expect the report to be ready

---

**2.** The Board of Supervisors was the official name for the Delaware County Republican organization. It was not an elected governmental body.

**3.** The "Sprague" referred to by Williams is Richard A. Sprague, who was then First Assistant District Attorney of Philadelphia County. Sprague had been retained by McEwen to investigate charges by the Pennsylvania Crime Commission of widespread corruption among Delaware County public officials.

mid-summer. As far as the reasons why, I guess they would rather, they, they would be more appropriately addressed to Mr. Sprague himself. He indicated at that time, however, he had other matters that required his attention, such as the conviction of the ten or so defendants of murder, including Mr. Boyle more recently in the Delaware County courts, so that Mr. Sprague was brought in 1971 as an independent investigator, as an independent prosecutor, and that concept began in Delaware County so the people of the County could have confidence in the District Attorney's office. Mr. Williams' charges about reports that I have and Mr. Sprague has is just incorrect. There is no such report. And that's that. Now you can take the word of Mr. Sprague or Mr. Williams, and I'll ride any time with Mr. Sprague, that's for sure.

On May 2, 1974, one day after the taping and three days before "Update" was aired, Dickey's attorney, Alvin Ackerman, telephoned Melvin Levine, Director of Technical Operations and Administration for Channel 10, and John L. Essig, Channel 10 News Operations Manager. He told them that the charges against Dickey were false and defamatory, and asked that the May 5 scheduled broadcast of "Update" be postponed pending further investigation of the truth or falsity of Williams' statements.

On May 3, Ackerman wrote to Levine and Essig, reiterating his position. The letter to Levine stated:

Dear Mr. Levine:

In accordance with our telephone conversation yesterday, I wish to confirm that I represent Mr. Samuel R. Dickey. As I told you during that telephone conversation, it is my understanding that WCAU–TV intends to telecast a prerecorded interview with Congressman Lawrence Williams on its 'Update' program scheduled Sunday, May 5, 1974. It is further my understanding that false and defamatory accusations against my client were made during the course of this interview and will be further published by the aforementioned telecast. I asked that you withhold the showing of this program pending an investigation of the accusations which, I am certain, you will then find are completely false.

When I called your office late yesterday afternoon to determine what decision, if any, you had made with respect to my client's request, I was referred to Mr. Jack Essig who advised me that he had been made aware of the objection I raised and that a copy of the tape was being forwarded to your legal department for an opinion but that it was still the intention of WCAU–TV to telecast the program as scheduled.

I submit that the airing of this program would be completely irresponsible and result in great damage to Mr. Dickey's reputation. I once again insist that you not further aid those who would falsely vilify Mr. Dickey by an additional publication of these libelous statements. Should you persist in your attempts to do so you may be assured that Mr. Dickey will pursue all legal remedies that are available to him to their fullest extent.

Very truly yours,
Alvin S. Ackerman

On May 2, Cryor informed Robert Morse, the Channel 10 news director, that Williams had made serious charges against Dickey at the taping. Morse assigned Bill Baldini, a Channel 10 reporter familiar with Delaware County politics, to talk with Williams and Dickey and to attempt to get from Williams information substantiating Williams' charges. Baldini attempted to reach Dickey, Ackerman, and Harry McNichol, the Chairman of the War Board, but none of them returned his calls.

Baldini did reach Williams on May 2 and arranged for an interview to take place at Williams' home later that day. Baldini asked Williams during the interview to give him a copy or to let him see a copy of the Sprague report but Williams rejected Baldini's requests. Williams also refused to give Baldini the names of the informants who allegedly provided him with the information that formed the basis of his charges. The trial court found, however, that Wil-

liams told Baldini that "a lot" of his information "was based on his personal experience" as a former, long-time member of the War Board. Williams also stated that he realized the seriousness of the charges he had made and that he would stake his reputation on their accuracy.

Baldini reported back to Morse on May 4, the day before "Update" was to be shown. He described his interview with Williams in detail and stated that because Williams was involved in a closely contested election campaign, he viewed Williams' charges with a jaundiced eye. Nevertheless, the trial court found that Baldini concluded, and so informed Morse, that "there was a good probability that Williams was telling the truth."

"Update" was broadcast as scheduled on May 5. That evening, on the 7:00 p.m. news, Williams' remarks were shown on videotape, followed by a live appearance by Ackerman in which he denied the charges made against Dickey and denied the existence of the Sprague report. On the 11:15 news that same evening, Williams' statements and Ackerman's response were rebroadcast. Subsequently, Dickey brought this defamation suit against CBS in the Eastern District of Pennsylvania.[4]

### THE TRIAL COURT'S OPINION

The district court found that in deciding to air "Update", Morse of CBS took into account that:

(a) Congressman Williams had come prepared to make the statements he made. His charges were not off-the-cuff responses to any questions asked, but were worked into a response to a question concerning inflation.

(b) Williams was a four-term Congressman and that gave him a great deal of credibility.

(c) While Williams spoke of quoting the Sprague report, he actually waved papers around, which certainly implied that he possessed the report or portions of it and was quoting from it.

(d) Since Williams had been associated with and been supported by the War Board for a great number of years, and was thoroughly familiar with Delaware County politics, it was reasonable to believe he knew whereof he spoke.

(e) The Sprague report's release was indeed anticipated at that point in time and what Sprague said carried weight; therefore Williams' stated source was not a vague unknown one.

(f) Williams' charges were not generalized, but specific, naming names and amounts, indicating real knowledge, not wild charges.

(g) Although sometimes wild charges are made in the heat of debate, this was not the case here because Williams did not back off a bit when Baldini interviewed him two days later in relaxing circumstances at his home.

(h) The charges made by Williams were consistent with on-going news stories over several years concerning alleged corruption in Delaware County politics, including alleged corruption on the part of the War Board and Mr. Dickey.

(i) The Baldini interview.

The trial court also found, however, that Morse had knowledge:

[O]f Baldini's suspicion.

That McEwen, who appeared on the program with Williams, was and had been District Attorney of Delaware County for eight (8) years, had denied the existence of the Sprague report during the taping of the Update program, which Morse had viewed and listened to.

That Williams, having been involved in Delaware County politics for a long time, had never made these charges previously.

That Sprague was a man of considerable reputation and anything he said would carry a substantial amount of weight.

That McEwen, during the taping of the Update Program, which Morse listened to

and viewed prior to telecasting the program, stated that he and Sprague held a press conference to which Williams was invited but did not appear, and that Sprague stated that at that time he had not yet prepared his report of the investigation of Delaware County.

The district court found that Williams' allegations were false and concluded that "[i]t strains all credulity to suggest that CBS was interested in determining the truth of the charges when with all the resources at its command, it made no effort whatever to contact Sprague . . . . The evidence clearly suggests to me that the efforts orchestrated by Morse were designed not so much to verify Williams' charges as it was (sic) to promote and perpetuate a controversy by having the (charges) repeated in order to induce a response by the 'other side.'"

The trial court nevertheless held that CBS's lack of concern about the truth of Williams' assertions was an insufficient basis for liability. The court read *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), as requiring proof by clear and convincing evidence "that the defendant in fact entertained serious doubts as to the truth" of the charges by Williams, and held that Dickey failed to meet this burden.

### THE ISSUES ON APPEAL

On appeal from the district court's judgment entered in favor of CBS, appellant Dickey's sole contention is that the evidence introduced at trial was constitutionally sufficient to support a verdict in his favor. Appellee CBS presents a two-fold argument. First, it asks this Court to recognize, as the Second Circuit has in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), a constitutional privilege of neutral reportage. The privilege would grant the press absolute immunity from libel judgments for accurately reporting "newsworthy" statements, regardless of the press's belief about the truth of the statements. Second, appellee

asserts that the trial court was correct in finding that appellant failed to meet its burden of proving actual malice.

At the outset, we reject appellee's invitation to adopt *Edwards, supra*, as the rule of this Court. The apparent holding of *Edwards*—that whenever remarks are judged by the press to be "newsworthy," 556 F.2d at 120, they may be published without fear of a libel suit even if the publisher "has serious doubts regarding their truth", *id.*,—is contrary to the Supreme Court's ruling in *St. Amant, supra*. While the Second Circuit found that there can be no liability despite the publisher's "serious doubts" as to truthfulness, *St. Amant* holds that for libel against a public figure to be proved, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained *serious doubts* as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." 390 U.S. at 731, 88 S.Ct. at 1325 (emphasis added).

At no time during argument or in its brief did appellee attempt to reconcile the *Edwards* rule with *St. Amant*. Instead, counsel for appellee contended at argument that *Edwards* was foreshadowed by the Supreme Court's decision in *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). *Pape* arose out of an article in *Time* Magazine quoting parts of volume five of the Report of the United States Commission on Civil Rights, entitled "Justice." One paragraph of "Justice", dealing with police brutality, listed in detail *allegations* by one Monroe against several Chicago police officers, which were contained in a complaint filed in federal court. *Time* quoted the allegations in its article without attributing them to the *Monroe* complaint, thus making it appear that the allegations were factual findings by the Commission. Pape, the Deputy Chief of Detectives of the Chicago Police Department, brought a libel suit against *Time*, and it was admitted at trial that *Time* was aware "at the time of publication that the wording of the Commission Report had been significantly altered." *Id.* at 285, 91 S.Ct. at 637.

The Seventh Circuit concluded that the alteration amounted to a falsification of the Commission's report, and suggested that malice might be inferred from the act of deliberate alteration. The Supreme Court reversed, ruling that the Seventh Circuit's analysis "may be adequate when the alleged libel purports to be an eyewitness or other direct account of events that speak for themselves . . . . But a vast amount of what is published in the daily and periodical press purports to be descriptive of what somebody *said* rather than of what anybody *did*. . . . The question of the 'truth' of such an indirect newspaper report presents rather complicated problems." *Id.* at 285–86, 91 S.Ct. at 637 (emphasis in the original). Elsewhere, the Court noted that a case in which a media member publishes the false remarks of a third party, rather than makes false statements itself "differs . . . from the conventional libel case." *Id.* at 285, 91 S.Ct. at 637.

Although appellee's counsel did not elaborate on why *Pape* lends support to *Edwards,* he presumably read the language quoted above as a recognition by the Supreme Court that cases such as *Pape, Edwards,* and this one, involving false statements by a third party which have been published by the press, are entitled to a unique constitutional analysis. This Court cannot subscribe, however, to such an ambitious reading of *Pape.* In fact, the Supreme Court's purpose in stating that *Time*

was quoting from a third party appears to have been merely to emphasize the difficulty in accurately interpreting and communicating a third party's meaning without quoting the third party's statement in its entirety. *See id.* at 286–92, 91 S.Ct. 633. This more limited reading of *Pape* is supported by the Court's repeated references to the Commission's own ambiguity regarding the truth of the episodes of police brutality which it related, *see id.* at 286–89, 91 S.Ct. 633, and the Court's holding that "[i]n light of the totality of what was said in Justice, we cannot agree that, when Time failed to state that the Commission in reporting the Monroe incident had technically confined itself to the allegations of a complaint, *Time engaged in a 'falsification' sufficient in itself to sustain a jury finding of 'actual malice.'"* *Id.* at 289, 91 S.Ct. at 639 (emphasis added). So interpreted, *Pape* holds that whether a periodical's reporting of the statement of another person is *deliberately* inaccurate must be carefully scrutinized. It is thus inapposite to both *Edwards* and this case, in which the accuracy of the press's reporting of the third party's statements— as opposed to the accuracy of the third party statements themselves—is admitted.

We therefore conclude that a constitutional privilege of neutral reportage is not created, as appellee would have us find, merely because an individual newspaper or television or radio station decides that a particular statement is newsworthy.[5]

---

5. Even if *Edwards* and *St. Amant* were reconcilable, we are doubtful that the *Edwards* theory is consistent with *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Although the plaintiffs in *Edwards* were public figures, and although there is a reference in that case ·to "the interest of a public figure in the purity of his reputation," 556 F.2d at 122, it appears that what triggers the existence of the constitutional privilege of neutral reportage, according to *Edwards,* is not whether the plaintiff is a public or private figure, but whether the statement published by the defendant is "newsworthy." *See id.* at 120 ("We do not believe that the press may be required under the First Amendment to suppress *newsworthy statements* merely because it has serious doubts regarding their truth") (emphasis added).

In *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), the plurality opinion by Justice Brennan reached the conclusion, which *Edwards* seems to track, that whether or not the high standard of proof of *Sullivan, supra,* and *St. Amant, supra,* is required is dependent on the "public or general interest" in the subject matter, *id.* at 43, 91 S.Ct. 1811, rather than on the identity of the person defamed. That part of the opinion which adopted the "public or general interest" test was repudiated, however, by the opinion of the Court in *Gertz, supra,* 418 U.S. at 344–46, 94 S.Ct. 2997. There, the Court held that application of the *Sullivan* standard must be determined by reference to the public or private status of the plaintiff, *see id.,* instead of to the content of the defamatory statement.

Turning to the correctness of the district court's holding that appellant Dickey had failed to satisfy his burden of proof, we begin by noting that appellant has admitted to being a public figure. Brief for Appellant at 1. Thus, appellant is governed by the Supreme Court's holdings in *Sullivan* and *Curtis Publishing Co. v. Butts,*[6] 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), that a public official or public figure must prove with "convincing clarity,"[7] 376 U.S. at 285–86, 84 S.Ct. 710, that a false statement was published "with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 726.

Appellant further admits that under the rule of *St. Amant, supra,* recklessness "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts as to the truth* of his publication." Brief for Appellant at 2, *quoting St. Amant, supra,* 390 U.S. at 731, 88 S.Ct. 1323 (emphasis added). Appellant contends, however, that the district court erred in holding that the *St. Amant* test, properly construed, had not been met. He asserts that the trial court misinterpreted *St. Amant* by requiring "a direct admission" by CBS, Brief for Appellant at 6, that

it doubted the truth of Williams' allegations, thus "precluding a plaintiff from proving recklessness by circumstantial proof." *Id.* The circumstantial proof that appellant suggests shows most strongly that CBS had serious doubts about the truth of Williams' charges is the evidence indicating that CBS had the resources and the time to investigate the charges more carefully, particularly by checking with Sprague about the existence and substance of his report.

■ This argument does not accurately portray the trial court's analysis. There is no indication whatsoever that the court ruled that circumstantial evidence cannot as a matter of law be used to prove actual malice. Rather, in view of the court's extensive findings regarding the very evidence which appellant urges us to consider in this appeal, it is evident that the court took plaintiff's evidence into consideration but nevertheless concluded that CBS's failure to investigate the charges adequately did not—within all the circumstances of this case—demonstrate actual malice by clear and convincing proof.

The correctness of the district court's holding is evident from a comparison of *Sullivan* and *St. Amant* with the facts of this case. In *Sullivan,* the Supreme Court held that evidence showing a failure by the *New York Times* to investigate *its own*

6. The plaintiff in the *Sullivan* case—an elected Commissioner of the city of Montgomery, Alabama—was a public official. Therefore, the Supreme Court in *Sullivan* limited its holding to libel suits by public officials, 376 U.S. at 283, 84 S.Ct. 710. In *Curtis Publishing Co.,* the Supreme Court was confronted with whether a libel suit by " 'public figures' whose views and actions with respect to public issues and events are often of as much concern to the citizen as the attitudes and behavior of 'public officials' with respect to the same issues and events," 388 U.S. at 162, 87 S.Ct. at 1995. (Warren, C. J., concurring in the result), was also governed by the *Sullivan* test. Although the opinion of Justice Harlan announcing the judgment of the Court did not apply the *Sullivan* test to public figures, *see id.* at 154–55, 87 S.Ct. 1975, five Justices concluded that *Sullivan* was applicable to public figures. *Id.* at 163, 87 S.Ct. 1975 (Warren, C. J., concurring in the result); *see id.* at 170, 87 S.Ct. 1975 (Black and Douglas, JJ.,

concurring in part and dissenting in part); *id.* at 172–73, 87 S.Ct. 1975 (Brennan and White, JJ., concurring in part and dissenting in part). Despite confusion stemming from the fact that the opinion announcing the Court's judgment does not adopt the majority's approach regarding public figures, the *Curtis* case stands for the proposition that public figures must prove "actual malice" in defamation suits. *See Time, Inc. v. Firestone,* 424 U.S. 448, 453, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); *Gertz, supra,* 418 U.S. at 335–37, 94 S.Ct. 2997.

7. In discussing a public figure's or public official's burden of persuasion in defamation actions, the Supreme Court has also used the phrase "clear and convincing proof," *Gertz, supra,* 418 U.S. at 342, 94 S.Ct. 2997. It is this formulation that is employed by both of the parties in this case.

*files,* which contained information exposing the falsity of certain of the statements published by the *Times,* was constitutionally inadequate to prove malice when "the record show[ed] that [the *Times*] relied upon [its] knowledge of the good reputation," 376 U.S. at 287, 84 S.Ct. at 730, of the authors of the advertisement in the *Times* which was the basis for the suit. In *St. Amant,* the Court found no actual malice even though the defendant, who relied on a source with no established reputation for reliability, failed to conduct any investigation at all; the Court concluded that "failure to investigate does not in itself establish bad faith." 390 U.S. at 733, 88 S.Ct. at 1326.[8] In accord with *Sullivan,* and in contrast to *St. Amant,* the trial court found that CBS's source, Williams, "had a great deal of credibility." In addition, CBS's investigation of Williams' charges, though characterized as inadequate by the trial court, was clearly more comprehensive than that carried out by the defendants in either *St. Amant* or *Sullivan.*[9]

Moreover, in the few circumstances in which the Supreme Court has found actual malice, *see, e. g., Curtis Publishing Co.,*

*supra,* or hypothesized about when actual malice might be inferred from circumstantial evidence, *St. Amant, supra,* the facts have been substantially different from those in this case.

In *Curtis Publishing Co.,* the Supreme Court affirmed a libel judgment against Curtis Publishing Co., the publishers of the *Saturday Evening Post,* arising out of the publication of an article accusing Butts, the athletic director of the University of Georgia, of disclosing his team's game plan to the head coach of the University of Alabama football team, prior to the game between the two schools. The sole source of the *Post's* story was a convicted criminal who allegedly heard, through an accidental foul-up in the telephone lines, Butts' conversation with the Alabama coach. Despite the apparent unreliability of the source, and the sheer improbability of the story, the *Post* failed to institute virtually any investigation of the convict's charges, and assigned to the story a reporter who was inexpert in the subject matter. 388 U.S. at 157–58, 87 S.Ct. 1975 (opinion of Harlan, J.). The Supreme Court ruled that sufficient

---

**8.** This Circuit anticipated the conclusion of *St. Amant,* holding in *Baldine v. Sharon Herald Co.,* 391 F.2d 703 (3d Cir. 1968), that "investigatory failures alone are insufficient to show recklessness on the part of" a defendant. *Id.* at 706.

**9.** Appellant asserts that this case is constitutionally distinct from *St. Amant* and *Sullivan* because of the existence of prepublication denials by Ackerman and McEwen of the truth of Williams' charges, and because the broadcast of "Update" was allegedly not "hot news" in that, because the primary was two weeks after the broadcast date, the broadcast could have been delayed pending a more detailed investigation. The cases which appellant advances in support of this argument do not, however, aid his cause. *Church of Scientology of California v. Dell Publishing Co.,* 362 F.Supp. 767 (N.D. Cal.1973), merely states that "prepublication denials and demands for retraction are not decisive either way, but are for the trier of fact to determine under the circumstances as a part of the overall questions of knowledge and recklessness." *Id.* at 770. The trial court in the case before us explicitly took Ackerman's and McEwen's denials into account, Findings of Fact Nos. 12–13, 24(2), but nevertheless found that serious doubt as to truth was not suffi-

ciently proven. No more than that is required. In *Rosenbloom v. Metromedia, Inc.,* 415 F.2d 892 (3d Cir. 1969), *aff'd,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), this Court stated that with respect to false statements on "hot news" broadcasts, "[t]he need for constitutional protection . . . is much more apparent than in the cases of the so-called documentaries or feature stories where time is available to verify questionable material." 415 F.2d at 895–96. *Rosenbloom,* however, involved a "hot news" broadcast and did not attempt to define the degree of investigation necessary in other types of libel cases. Moreover, *Rosenbloom* must be read in the context of *St. Amant's* holding that no finding of libel is constitutionally permissible without proof of serious doubt. The trial court took note that "Update" was not "hot news," Finding of Fact No. 44; we cannot conclude that it erred in assigning that fact less weight than appellant would like. Finally, the only putative support for appellant's position in *Vandenburg v. Newsweek, Inc.,* 441 F.2d 378, 380 (5th Cir.), *cert. denied,* 404 U.S. 864, 92 S.Ct. 49, 30 L.Ed.2d 108 (1971), is a citation to *Curtis Publishing Co.,* which is factually not apposite to *Dickey.* See p. 1229.

evidence of reckless disregard for the truth could be inferred from those facts.

In *St. Amant,* the Court, in part explaining its decision in *Curtis Publishing Co., see* 390 U.S. at 732 n.3, 88 S.Ct. 1323, hypothesized that actual malice might be inferred when "a story is fabricated by the defendant, . . . is based wholly on an unverified anonymous telephone call . . . , when the publisher's allegations are so inherently unprobable that only a reckless man would have put them in circulation . . . (or) where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U.S. at 732, 88 S.Ct. at 1326.

At the risk of belaboring the point, we think that the facts of the case before us are radically divergent from the facts of *Curtis* and those posited in *St. Amant.* The charges against Dickey were clearly not invented by CBS nor gleaned from an unknown source; instead they were made by a veteran congressman who was intimately acquainted with the subject and content of his charges by virtue of his long relationship with the War Board, who refused to retract or modify his charges when privately given the opportunity to do so by Baldini the next day, and who rested his reputation on the accuracy of his allegations. In addition, in view of the widespread rumors of corruption in Delaware County politics and the detailed nature of the charges, Williams' statements were hardly improbable; it would have been perfectly reasonable for Baldini to believe, as the trial court found he did, that "there was a good probability that Williams was telling the truth." Examining all the evidence then, it is clear to us that the trial court's conclusion that serious doubt was not proven by the appropriate constitutional standard was correct.

The judgment of the district court will be affirmed.