John Tim McCALL, Movant,

v.

COURIER–JOURNAL AND LOUIS-
VILLE TIMES COMPANY, et
al., Respondents.

Supreme Court of Kentucky.

Oct. 13, 1981.

Rehearing Denied Dec. 15, 1981.

Edward M. Post, Taustine, Post, Berman, Fineman & Kohn, Louisville, for movant.

Edgar A. Zingman, Sheryl G. Snyder, Raymond M. Burse, Wyatt, Tarrant & Combs, Louisville, for respondents.

## OPINION OF THE COURT

The general problem to be addressed on this appeal is the tort liability of print media to private citizens for the publication of defamatory statements and for the invasion of their right of privacy. The specific issue to be decided deals with such liability for the contents of an article appearing in the Louisville Times, a daily newspaper of substantial circulation distributed primarily in Jefferson County, Kentucky.

Movant, John Tim McCall, a Louisville attorney, was contacted by Kristie Frazier about the possibility of his representing her in two narcotic-related criminal charges. About the same time, respondents Krantz and Van Howe, reporters for the Times, were investigating alleged harassment of the drug community by narcotics agents and other local police. In the course of their investigation, the reporters interviewed Frazier who informed them that McCall had offered to represent her for a contingent fee and that part of the fee

would be used to "fix" the cases or to bribe a judge. On March 17, 1976, the Times published a front page article, authored by Krantz and Van Howe, which described the results of the investigation, including the repetition of the allegations of bribery and a "fix." [1]

McCall filed suit against the two reporters and the Courier-Journal and Louisville Times Company, which owns and operates the Times. The basis of the suit was twofold: (1) libel, for publishing the allegation of a "fix" or bribery, even though the charge admittedly could not be sustained, and (2) invasion of McCall's right of privacy. The trial judge granted summary judgment to the newspaper and the reporters. The Court of Appeals affirmed. Because of the importance of the issues raised, we granted discretionary review.

Movant argues that (1) the statement that he as an attorney was guilty of intent to bribe a judge or "fix" a case is defamatory; (2) the newspaper libeled him as a private citizen by simply printing such an allegation, even though the reporters did not specifically accuse him of bribing a judge or "fixing" a case; and (3) the newspaper invaded his privacy by arranging for Frazier to trespass on his property with a tape recorder concealed in her purse. Respondents argue that (1) the article when read as a whole is not libelous; (2) a newspaper cannot be held strictly liable for publishing defamatory statements about private individuals; and (3) newspapers are not guilty of libel when they simply report what occurred.

We will discuss the two possible bases of liability, libel and invasion of privacy, separately.

## I. LIBEL

### A. WAS THE ARTICLE LIBELOUS?

■ Libel is the publication of a written, defamatory, and unprivileged statement. Writing and publication are conceded here. The writing is defamatory if it tends to (1)

bring a person into public hatred, contempt or ridicule; (2) cause him to be shunned or avoided; or, (3) injure him in his business or occupation.

It is an elementary principle of the law of libel that the defamatory matter complained of should be construed as a whole. *Smith v. Pure Oil Co.*, 278 Ky. 430, 128 S.W.2d 931 (1939); Restatement (Second) of Torts, Sec. 563, comment d (1976). The alleged defamatory words must be measured by their natural and probable effect on the mind of the average lay reader and not be subjected to the critical analysis of the legal mind. *Digest Publishing Company v. Perry Publishing Co.*, Ky., 284 S.W.2d 832 (1955). We must, therefore, analyze the article in its entirety and determine if its gist or sting is defamatory.

The gist of the article is that the reporters became interested in McCall's conduct while they were interviewing Frazier on another matter. She alleged, in the first interview, that McCall had offered to "fix" her case for $10,000. Frazier signed an affidavit to the effect that McCall for said fee would guarantee that she would "walk in the courtroom and turn around and walk back out." A witness corroborated that McCall had said this. The interview and the affidavits relating to an alleged "fix" were the sparks that ignited the investigation and the subsequent publication of the article.

At the instance of the two reporters, Frazier agreed to make an appointment with McCall, and to carry a concealed tape recorder. She was told only one specific question to ask: "Can't this case be handled in the regular way for $1,500, without a payoff, or does it have to take $10,000 to keep me out of jail?" The plan was that if the answer given by McCall to that question (and presumably any other incriminating statement he made) constituted an attempt to bribe a judge,[2] the newspaper would provide the money. Following the meeting between McCall and Frazier, the Times an-

---

1. The article in its entirety is incorporated in Justice Lukowsky's separate opinion.

2. KRS 521.020 makes it a felony to bribe a judicial officer.

alyzed the transcript of their conversation and "found no indication of any 'fix'."

In spite of this conclusion, the Times decided to publish a detailed description of the entire transaction. The story appeared on page one and included the allegations made by Frazier and her witness that McCall had offered to "fix" the case or bribe a judge. These allegations were published, *in spite of the fact that the newspaper knew—and admitted it knew—that there was no evidence of any such crime on the part of McCall.*

What we have is a situation where the newspaper says to the reader, "we don't find any evidence of a crime on the part of McCall, but we heard some contrary stories and we are going to repeat them anyway." Contrary to the statement of respondents' counsel that there were only one or two references to an alleged illegal act of McCall in the article, we have found references in nine paragraphs in the article which use the words "fix," "illegally," "improper offers," "possible mishandling," "fix or bribe," "payoff," and "illegal way." All these terms refer to the allegations of McCall's alleged misconduct.

In addition, the article spends a great deal of time to show that a contingent fee, allegedly suggested by McCall in a criminal case, may be a serious violation of the canons of legal ethics. The article unquestionably paints a sordid picture of McCall as an attorney. The repeated use of the words "fix," "bribe," etc., with reference to McCall, are so overwhelming that a lay person would, we believe, inevitably conclude that McCall did solicit a high legal fee for the purpose of "fixing" a case or bribing a judge. We conclude that the article in question is defamatory as a matter of law.

### B. IS THE NEWSPAPER LIABLE FOR PUBLICATION OF THE DEFAMATORY STATEMENTS?

In the present case, the newspaper did not specifically accuse McCall of offering to "fix" the case or to bribe a judge. It simply repeated numerous times the allegations made to this effect. The newspaper argues that it is not liable to McCall because there has been no showing of fault in its actions in printing these statements of another, and that it is not strictly liable for what appears on its pages, even if the stories are defamatory.

The Federal courts, led by the United States Supreme Court, have been developing a body of law in recent years which defines the protection the First and Fourteenth Amendments give the press for libelous publications.

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court ruled that damages could not be recovered for defamation of a *public official* without clear and convincing evidence of actual malice on the part of the publisher. Actual malice requires a showing of knowledge of falsity of the defamatory statement or reckless disregard of its truth or falsity. *Id.* In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the court applied the *Sullivan* standard of defamation to *"public figures."* In *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), the court, in a plurality opinion, applied *Sullivan* to a publication concerning *private individuals* where the matter was of concern to the public.

If the Supreme Court had left *Rosenbloom* untouched, respondent here clearly would have had the right to publish the defamatory statements made by Frazier about McCall (who concededly is a private individual) with relative impunity because they dealt with a matter of public interest, *viz.,* possible bribery of a judge or "fixing a case". The Court modified the *Rosenbloom* case and retreated from it in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). This case sounded the death knell of the doctrine of liability without fault in libel cases by private individuals against media defendants. The Court ruled that each state may allow private individuals to recover compensatory damages, even if the defendant publisher or broadcaster disseminated the defamatory statement without actual malice.

"[S]o long as they do not impose liability without fault, the states may define for

themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."

*Id.* at 347, 94 S.Ct. at 3010, 41 L.Ed.2d at 809. See *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), where the court characterized *Gertz* as a repudiation of *Rosenbloom* with respect to defamation of private individuals.

While it is not our function to approve or disapprove the ruling or reasoning of the Supreme Court, we concur in the rationale that the court used in balancing the interests of the press with those of private individuals. Private individuals and their reputations were declared to be more deserving of protection from defamation than those of public figures or public officials. Private individuals do not have the easy access to the self-help remedy of response to defamatory falsehoods via the news media that public persons have. Moreover, they neither voluntarily nor involuntarily expose themselves to public scrutiny by seeking or holding public office or assuming a prominent or influential role in society. In the parlance of the horse industry, part of the turf of being a public official or public person is to be subject to public scrutiny. This is not necessarily so in the case of private citizens.

Following the decision in *Gertz*, many states adopted standards of liability.[3] This court has not.[4] We have given considerable thought to an appropriate standard, recognizing the far-reaching effects of this ruling on the rights and duties of the press in this state. We are also aware of the fundamental right of private individuals to be free from being defamed.

The Kentucky Constitution guarantees freedom of the press, but holds newspapers accountable for abusing that liberty. Section 8 of the Constitution reads:

"Freedom of speech and of the press— Printing presses shall be free to every person who undertakes to examine the proceedings of the General Assembly or

any branch of government, and no law shall ever be made to restrain the right thereof. *Every person may freely speak, write and print on any subject, being responsible for the abuse of that liberty.*" (emphasis added).

We believe that while it is our option under *Gertz* to adopt a standard of fault, Kentucky Const., Sec. 8, mandates that we adopt a standard which adequately protects the private individual from defamation. We choose simple negligence. The standard used by Tennessee is a reasonable one. In *Memphis Publishing Co. v. Nichols,* Tenn., 569 S.W.2d 412, 418 (1978), the Tennessee Supreme Court said:

"[T]he appropriate question to be determined from a preponderance of the evidence is whether the defendant exercised reasonable care and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it."

Another way of stating the standard is that a private plaintiff may recover on a showing of simple negligence, measured by what a reasonably prudent person would or would not have done under the same or similar circumstances.

The adoption of this standard does not imply any change in the basic common law and statutory rules of libel and slander as expressed and interpreted by this court in the past. See *Wilson v. Scripps-Howard Broadcasting Co.,* 642 F.2d 371 (6th Cir. 1981).

One further point remains on the question of liability. We are urged by the respondents to adopt the doctrine of neutral reportage. In *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113 (2d Cir. 1977), cert. denied, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), the Court of Appeals granted the press absolute immunity from liability for accurately reporting "newsworthy statements," regardless of the press' belief about the truth of the statements. This doctrine has not been approved by the Supreme Court of the United

---

3. There is a plethora of writing in this area. See, e. g., Spencer, Establishment of Fault in Post-Gertz Libel Cases, 21 St. Louis University Law Journal, 374 (1977); Sack, Libel, Slander and Related Problems, R. Sack (1980); Hecht, The Defamation Action for Private Individuals: The New Fault Standard, 22 South Dakota Law Review 163 (1977).

4. The Court of Appeals in the case of *E. W. Scripps Co. v. Cholmondelay,* Ky.App., 569 S.W.2d 700 (1978) approved a circuit court instruction which set up a simple negligence standard.

States and has not received approval in other jurisdictions.[5]

We reject the doctrine. Accordingly, respondents' argument that they simply repeated allegations is without merit.

Having determined that the article which is the subject of this lawsuit is defamatory, having adopted a standard of fault pursuant to *Gertz* and Ky. Const. Sec. 8, and having rejected the doctrine of neutral reportage, we conclude that the Court of Appeals erred when it affirmed the trial court's grant of summary judgment.[6]

## II

### INVASION OF McCALL'S RIGHT OF PRIVACY

As part of his complaint, McCall alleged that the reporters invaded his privacy by concealing a tape recorder in Frazier's purse prior to her entering his office. In his amended complaint, McCall also attacked the newspaper article as being an invasion of privacy, in that it "implies that the Plaintiff is an unethical and dishonest attorney practicing in Jefferson County and places [him] *in a false light before the members of the general public.*" (Emphasis added.)

The trial court rejected both claims when it granted summary judgment. The court declared that the use of the recording device was not an invasion of the plaintiff's right of privacy and that McCall was not "placed in a false light" because the article was not false and did not constitute reckless behavior.

In affirming the trial court, the Court of Appeals did not consider the "false light" ruling, but addressed only the problem of the use of the concealed tape recorder. Because we decide the issue on the basis of "false light," we do not deem it necessary to discuss the other aspect of the right of privacy claim.

■ The invasion of privacy as an actionable tort has been part of Kentucky law since 1909.[7] Subsequently, the development

of this theory of law has grown at a modest pace.[8] The basis of the tort, while not subject to precise definition, may be best described as the right of every citizen to be "let" alone. Private individuals have the right to live their lives without unwarranted interference by the public about matters with which the public is not necessarily concerned. *Brents v. Morgan*, 221 Ky. 765, 299 S.W. 967 (1927). There are exceptions to this rather sweeping principle of law. The right of privacy does not prohibit: (1) any publication of a matter which is of public or general interest; (2) the publication of a matter which is a privileged communication according to libel and slander law; (3) statements which are oral; and (4) a publication which is true. *Id.* Kentucky has not specifically adopted the "false light" aspect of the tort.

■ We believe that the principles enumerated in *Foster Milburn Co. v. Chinn,* supra at note 7, and *Brents v. Morgan,* supra, which set forth the bases and nature of the tort of invasion of privacy, would best be furthered by our adoption of the principles of that tort as enunciated in the Restatement (Second) of Torts (1976). The pertinent section reads:

"Sec. 652A.  General Principle
(1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.
(2) The right of privacy is invaded by
(a) unreasonable intrusion upon the seclusion of another...; or
(b) appropriation of the other's name or likeness ...; or
(c) unreasonable publicity given to the other's private life ..., or
(d) publicity that unreasonably places the other in a false light before the public ...."

As we view this aspect of the appeal, the issue is whether the trial court erred in ruling that the Louisville Times article did not place McCall before the public in a false light.

---

5. See, e. g., *Dickey v. CBS, Inc.*, 583 F.2d 1221 (3rd Cir. 1978). The doctrine has also been criticized in many academic treatises. See, e. g., The Privilege of Neutral Reportage, 1978 Utah Law Review 347.

6. With respect to damages, *Gertz* limits recovery to any and all actually proved damages. With respect to punitive damages, see KRS 411.051(1).

7. *Foster-Milburn Co. v. Chinn*, 134 Ky. 424, 120 S.W. 364 (1909).

8. For an excellent discussion of invasion of privacy, see Bunch, Kentucky's Invasion of Privacy Tort—A Reappraisal, 56 Kentucky Law Journal 261 (1967–68).

The two basic requirements to sustain such an action are: (1) the false light in which the other was placed would be highly offensive to a reasonable person, and (2) the publisher had knowledge of, or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other was placed. Restatement (Second) of Torts, Sec. 652E (1976).[9]

McCall's amended complaint alleged that the article implied to the public that he was an "unethical and dishonest attorney" and that such publicity placed him in a "false light" before the public. Our view as to the impact of the article has been expressed in the section of the opinion dealing with libel. The article clearly indicates that there was a probability that McCall was guilty of unethical conduct, and would be read by a lay person as having stated that he intended to "fix" a case or bribe a judge. We believe that the issue of false light should have been submitted to a jury.

With respect to the constitutional restrictions on the tort of invasion of privacy, there is a substantial gray area. In *Time v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), the Supreme Court examined, for the first time, the effects of the First and Fourteenth Amendments on this tort. The Court held that a state law protecting privacy (whether statutory or judicial) no longer could permit recovery for injury to privacy upon proof of falsity alone, at least when the material published was of public interest and the injured party was a private individual. Recovery in such a situation was limited to those false publications which were made upon a showing of knowledge of the falsity of the statements or a reckless disregard as to the truth. The Court applied the malice standards of *New York Times v. Sullivan* to all privacy cases where matters of public interest were involved. The Court placed its emphasis on the nature of the subject matter, rather than on the status of the injured person.[10]

After *Hill*, the Supreme Court rendered *Gertz*. It will be remembered that in *Gertz* the Supreme Court ruled that in defamation cases a private individual could recover damages for published untrue defamatory statements so long as there was no strict liability imposed. Whether *Gertz* will be used to modify *Time v. Hill* is only speculation. Until the Supreme Court has spoken, we must comply with the ruling in *Hill*, and recovery is predicated on the standards set out therein. In the event the *Gertz* rule is applied, we believe the desirable standard of fault is that of simple negligence which we have adopted in this opinion for libel cases.

We have ruled in the past that if a publication deals with a matter of public interest or public concern, even if it invades a person's privacy, it is not subject to the tort of invasion of privacy. *Sellers v. Henry*, Ky., 329 S.W.2d 214 (1959); *Brents v. Morgan, supra.* Respondents argue, while not specifically mentioning "false light," that the defense of public interest should be applicable to all invasion of privacy cases. We do not agree. It should, and is, available as a defense in all those cases where the published statements are true. However, it is not available in cases of the publication of false statements, especially where a *private individual's* right of privacy is involved.

The damages which are recoverable for invasion of privacy are set forth in Restatement (Second) of Torts, Sec. 652H (1976). They are as follows:

"One who has established a cause of action for invasion of his privacy is entitled to recover damages for

(a) the harm to his interest in privacy resulting from the invasion;

(b) his mental distress proved to have been suffered if it is of a kind that normally results from such an invasion;

(c) special damages of which the invasion is a legal cause."

An action for defamation and an action for invasion of privacy (false light)

---

9. Much has been written as to the similarity of "false light" and defamation. The purpose of a false light action is to protect the individual in not being made to appear before the public in an unreasonably objectionable false light and otherwise than as he is. *To sustain this action, the person need not be defamed.* It is sufficient that the publicity attribute to him characteristics, conduct or beliefs that are false, and that he is placed before the public in a false position. See comment b to Restatement (Second) of Torts, Sec. 652E (1976). See also False Light—Invasion of Privacy? 15 Tulsa Law Review 113 (1979).

10. It seems logical that those same standards do not apply to a private person where the subject matter is not one of public interest.

are closely allied. An injured party may seek relief through both causes of action, arising out of the same publication, but he is limited to only one recovery.

By way of summary, we believe that the Court of Appeals erred when it affirmed the trial court's grant of summary judgment against McCall on his claim of invasion of privacy.

The decision of the Court of Appeals and the judgment of the trial court are reversed, and the cause is remanded to the Jefferson Circuit Court with instructions to take action in conformity with this opinion.

All concur.

LUKOWSKY, J., files a separate opinion.

LUKOWSKY, Justice.

I regret that I am unable to join in the majority opinion. Unfortunately, the majority paints with far too broad a brush. Among other things, they conjure up the question of a violation of the right of privacy through placing a person in a false light when that issue was never presented nor argued to either the Court of Appeals or this court. Their fervor to decide an abstract question of law without the framework of a concrete case and the advantage of briefing and argument escapes me.

In my view, all that is necessary to dispose of this case may be said as follows:

We granted discretionary review of this case so that we might define the impact of the decision of the Supreme Court of the United States in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) on the libel law of Kentucky.

The respondents wrote and published the following article in their newspaper which has a wide circulation in Kentucky:

The Louisville Times, Wednesday,
March 17, 1976

# Lawyer's 'guarantee' to keep woman free for $10,000 ethical?

**By RICHARD KRANTZ and TOM VAN HOWE**

© 1976, The Louisville Times

Louisville attorney Tim McCall, in possible violation of his profession's ethics, told a defendant in a criminal case here that for $10,000 he would either keep her out of jail or refund most of her money.

"(If) you don't go to jail or the penitentiary, then I'll charge you 10 grand. If you do, then . . . I'll charge you $1,000 for my trouble," McCall said last week to Kristie Frazier, 27, who is charged with trafficking in narcotics.

". . . In other words," McCall said, "I'm guaranteeing you for nine grand more that you won't—that nothing will happen to you."

McCall, 34, a cochairman of the Louisville Bar Association's Criminal Practices Committee, denied making any unethical guarantee to Miss Frazier, or doing anything else unethical involving her case.

According to a tape recording of the conversation between McCall and Miss Frazier, McCall also told the woman that if she raised $10,000 he would tell a prosecutor and a judge "that I'm making a substantial fee, and maybe the prosecutor will be sympathetic to me, and he will, too . . . they'll help me, and that'll help you."

When Miss Frazier expressed concern about her court appearance Monday and the possibility of her going to jail this week, McCall told her, "Hey, don't worry about it—I'm going fishing with (Criminal Court Judge John P.) Hayes Friday. All weekend."

Any such statements made by a lawyer to a prospective client may violate two rules of the Code of Professional Responsibility of the American Bar Association (ABA), according to ABA spokesmen.

One rule prohibits lawyers, under penalty of bar association discipline, from agreeing upon a "contingency fee" in a criminal case.

A contingency fee, in effect, when an attorney sets a certain fee if the case is won, and a lesser fee if the case is lost.

The other prohibits lawyers from implying that they are able to "influence improperly" any tribunal or public official.

The conversation between McCall and Miss Frazier occurred last Wednesday in McCall's office. At the request of the Louisville Times, Miss Frazier recorded the conversation on a tape recorder in her purse.

During the conversation, Miss Frazier stated at least twice that McCall would be using the $10,000 she would raise to "fix" the case. After each such statement McCall stated that no "fix" or other illegal action, such as a payoff, would be involved. Once McCall said, "It's not a fix. Don't talk like that."

At another point, he said, "The $10,000 would be my legal fee and I'll figure out some way to get you out of this if I have to import the damnedest lawyer in town to do something.

In a telephone interview Monday, Mc-

See WAS LAWYER'S
Back page, col. 2, this section

890

# Was lawyer's freed

**KRISTIE FRAZIER**
Taped conversation with lawyer.

**Continued From Page One**

Call said: "I don't think that any statement I made to Miss Frazier violates any code of ethics for attorneys or judges. I don't believe that I was unethical with her or agreed to do anything illegal."

McCall said he made no absolute guarantees of the results of the case to Miss Frazier.

"A guarantee," he said, "is when you tell somebody it is going to be that way —and no other alternative. I never told her that."

**'Not a contingent fee'**

McCall also said that while a "purely contingent fee" is unethical in a criminal case, his proposed arrangement with Miss Frazier was "not a contingent fee." He said a contingent fee can be based on the outcome of a case or on the amount of work involved. He refused to discuss, however, whether his statements fell into either category.

McCall said the only reason he even agreed to talk to Miss Frazier about her case was because "two good clients of mine called me and asked me to help this girl out."

McCall added that his statement to Miss Frazier—that she shouldn't worry, because he was going fishing with Judge Hayes—meant "only that I was going fishing with Judge Hayes—and I didn't."

McCall said he never mentioned Miss Frazier's name on the fishing trip and added that he would not discuss a case out of court with a judge unless a prosecutor was present.

Judge Hayes, asked yesterday about the weekend fishing trip with McCall, said there was no conversation between himself and the attorney about Miss Frazier's case.

McCall said other attorneys, including a prosecutor, had been invited to accompany McCall and Hayes on the trip. But, McCall said, only a policeman accompanied them.

**3 authorities consulted**

The Times consulted two national authorities and one local authority on ethics in the legal profession.

Two of them said they would comment only if their names were not used. Both of these persons were associated with legal ethics committees on a national or local level.

All three agreed that there seemed to be a contingency fee involved in the case described to them by The Times. They said this was clearly unethical.

One man queried was Philadelphia attorney Lewis Van Dusen, the national chairman of the ABA's Ethics Committee.

"That's easy," Van Dusen said. "Contingent fees are not permissible in a criminal case." They are, however, permissible and common practice in civil cases, he said.

Two of the attorneys were asked whether it was proper for a lawyer to say not to worry because he is going fishing with the judge, and to say that he would try to seek sympathy by telling of his high fee.

One of them said that this seemed to be suggesting to a client that the lawyer could use "improper influence." He said he would have to know the full facts to be certain. The other said he could not comment without knowing the full facts.

All three experts said that they would have to know the precise facts of the case in order to comment further.

**Specializes in criminal law**

McCall, of 3400 Winchester Drive, specializes in the practice of criminal law. Early in his career, he served as both an assistant city attorney and as an assistant commonwealth's attorney. He is a 1966 graduate of the University of Louisville School of Law.

McCall on Monday asked Commonwealth's Atty. David Armstrong to bring the entire matter—including the actions of The Times in obtaining the tape—before a grand jury.

**Armstrong plans action**

Armstrong said yesterday that he intends to bring it before the grand jury and that he wants to determine if in fact, any unethical practices on the part of an attorney took place.

He also said he wants to determine if the press acted unethically or illegally by promoting or encouraging a bribe. He said if the newspaper or its representatives are guilty, he intends to prosecute.

He said he will prepare subpoenas to require the testimony before the grand jury of Times reporters who wrote the article. He said he will also seek to obtain the tape recording of the conversation between McCall and Miss Frazier.

The Times requested that Miss Frazier tape-record the conversation because the newspaper was attempting to investigate her allegations that McCall had offered to "fix" her case for $10,000. However, The Times found no indication of any "fix."

The Times first became interested in the case while interviewing Miss Frazier on another matter on March 3. She told reporters she could avoid going to jail if she could raise $10,000 to give to McCall.

She said that she went to McCall last January after some friends told her that he might be able to keep her out of jail.

At the January meeting in McCall's office, according to a sworn affidavit Miss Frazier gave to The Times, McCall told her that he would represent her, with no guarantees, for $1,500.

But for $10,000, Miss Frazier said in her affidavit, he would guarantee that she would "walk in the courtroom and turn around and walk back out."

**Backed by witness**

A witness to that meeting, who asked not be named, has also provided The Times with an affidavit supporting Miss Frazier's statements. However, McCall disputes Miss Frazier's account of that meeting.

Both Miss Frazier and the witness said they believed, based on the January conversation, that McCall intended to "fix" the case for $10,000.

After hearing their statements and receiving their signed affidavits, The Times decided to pursue the investigation.

The investigation was designed to determine if Miss Frazier's case was being handled illegally, and to see if the attorney had, in fact, made improper offers to a prospective client.

The Times asked Miss Frazier if she would agree to go back to McCall's office, with a tape recorder provided by The Times in her purse, to see if McCall would repeat what he had allegedly told her in January.

The Times told Miss Frazier that if

## page

# om 'guarantee' ethical?

**TIM McCALL**

Says actions weren't unethical

*1948 Photo*

the attorney indicated to her that he was actually going to "fix" the case, the newspaper would consider providing the $10,000 in an effort to detect any possible mishandling of the case.

The Times told Miss Frazier that the decision to provide the money would be based on what McCall said on the tape, and if there was a definite indication that a fix or bribe might be involved.

She was not instructed by The Times to mention a "fix" or a bribe, but just to say what she ordinarily might say in such a conversation.

She was told only one question to ask. That question was, "Can't this case be handled in the regular way for $1,500, without a payoff, or does it have to take $10,000 to keep me out of jail?"

Times reporters felt that such a question might elicit an answer from McCall which would indicate whether the case was to be handled in a normal, legal fashion, or possibly in an illegal way.

The Times also told Miss Frazier that if bribery of a court official was indicated, this would be illegal for her or The Times to participate in.

Following the second meeting between Miss Frazier and McCall, last Wednesday, the tape recording of their conversation was evaluated by Times editors, reporters and the newspaper's attorneys. The tape did not indicate payoffs that McCall contemplated to officials to dispose of the case, and the newspaper decided not to provide the money.

### Indicted last April

Miss Frazier was indicted by a Jefferson County grand jury on April 30, 1975, on a charge of selling a quantity of cocaine to an undercover narcotics agent of the Jefferson County Police Department.

She has steadily maintained she is innocent of the charge, which is pending before Criminal Court Judge George Kunzman.

After her indictment, Miss Frazier hired attorney Richard Nash Sr. to represent her.

Nash said he advised Miss Frazier to plead guilty to the charge and accept the commonwealth's offer of one year's confinement in the Kentucky Correctional Institute for Women at Pewee Valley.

Nash told The Times he feared that if the case went to trial a jury would convict her. Miss Frazier could then be sentenced to five to 10 years in a state prison.

Miss Frazier was convicted almost five years ago of possession of marijuana, and Judge Hayes sentenced her to six months in jail. The sentence was probated for five years, however, and she did not spend any time in jail.

Following her latest arrest on the charge of trafficking in narcotics, Judge Hayes filed his own motion to revoke her probation.

Nash said he felt her changes for freedom were so poor that he told her, before she appeared in court Monday, to "come prepared to go to jail."

Nash said he thought her best bet would be to accept a year at the Pewee Valley facility by pleading guilty to the present charge, rather than face six months of more disagreeable confinement in the county jail by having her probation revoked by Hayes on the 1971 conviction.

Miss Frazier, knowing the high likelihood of her going to jail, turned to McCall last January, seeking a way to keep her freedom.

McCall disagrees with Miss Frazier's account of their first discussion. McCall told The Times that he flatly refused to represent her at that time and "sent her back to her attorney (Nash)."

However, the tape recording made at last week's meeting indicates that McCall did not flatly refuse earlier to represent her. There are two references on the tape to their first meeting.

The first refers to the fee McCall quoted her.

"Yeah, now look," Miss Frazier said. "Okay, for 15—you told me you would represent me for $1,500...."

"Fifteen hundred dollars," McCall said interrupting, "no guarantees, no nothing."

"No guarantees," Miss Frazier responded, "no nothing. Right."

The second reference to their original conversation came when McCall asked Miss Frazier who arrested her.

After naming the officer, she added, "You said you were going to talk to him."

"I didn't talk to him." McCall responded, "because you, I, never came back to talk to you about it."

During their taped conversation last Wednesday, McCall said he would represent Miss Frazier under "three conditions."

"They are," McCall said, "Number one that (attorney) Nash has no objections to it...

"Number two," he continued, "that it's between you and myself, and nobody else discusses the fee..."

"Number three," McCall said, "is you have to take my word or you can trust (one of his clients) or somebody that knows me that if I get you out of it. By getting you out of it I mean you don't go to the penitentiary. It may be a probated sentence, it may be you have to leave the jurisdiction. If you don't go to jail or the penitentiary, then I'll charge you 10 grand. If you do, then I won't charge you—I'll charge you $1,000 for my trouble. But, in other words, I'm

guaranteeing you for nine grand more that you won't, that nothing will happen to you."

"So, if I blow," McCall added, "I have to give you your money back. . . . I'll say that you're going to be out of it. Something could possibly go wrong, and if it did, I'd give you your money back. It's that simple."

Later, McCall impressed upon Miss Frazier that she should not tell Nash about their arrangement.

". . . I just don't want anybody to know about it. Now I'm serious about that. I don't want Nash, I don't want any policemen, any judges—I don't want nobody to know about it but me. It's between you and me."

After McCall told Miss Frazier that he was simply doing her a favor, that he didn't need the extra business, she mentioned that she was to appear in court the following Monday (this week).

"I'm a nervous wreck," she said. "They're going to put me in jail, and it's Monday. See? It's Monday. Monday."

"Monday's the 15th?" McCall asked. "Do you mean it's scheduled for trial Monday?"

"That's what I mean," Miss Frazier said. "You got to do something. If I could get you the money Friday...."

"Hey," McCall interrupted, "don't worry about it—I'm going fishing with Hayes Friday. All weekend."

Moments later, McCall instructed Miss Frazier not to say anything about his fishing trip with Hayes.

". . . Going around telling people he and I are friends (could) put him on the spot," McCall said. "He's a very honest judge. I'm going to tell you, believe it or not, the only way I could straighten this out is through legal recourse and the fact that I can tell him that I'm making a substantial fee, and maybe the prosecutor will be sympathetic to me, and he will, too . . . they'll help me, and that'll help you."

"Okay," Miss Frazier said, "consider it done."

"I'll consider it done," McCall said, "when you come in here."

"With the $10,000," Miss Frazier said.

"Yeah," McCall replied.

Miss Frazier did not produce the $10,000, however, and Nash remained her attorney. Monday, when she appeared in court, she was offered the agreed upon deal from the commonwealth—one year in prison in return for a plea of guilty.

Miss Frazier reluctantly signed the necessary court papers. She said aloud that it was "ridiculous" to plead guilty to a crime she did not commit.

Judge Kunzman, noting that Miss Frazier had been talking in court to a reporter, then said he would refuse to accept the guilty plea.

Kunzman said he would not accept a plea of guilty from a defendant who was protesting her innocence at the same time.

As a result, both the matters in Hayes' court and in Kunzman's court were continued to June 14. Kunzman said she would stand trial at that time.

The movant was less than gratified to find himself the subject of this article. His response was to sue the respondents for libel. The trial court granted a summary judgment which dismissed movant's complaint. The Court of Appeals affirmed. We reverse and remand.

For the dissection of this case, libel may be defined as the publication of a written, defamatory, unprivileged statement. Writing and publication are conceded here. The copy is defamatory if it tends to (i) bring a person into public hatred, contempt or ridicule; (ii) cause him to be shunned or avoided; or (iii) injure him in his business or occupation.

If a fact-finder believes movant's version of the incidents upon which the copy is based, false statements were disseminated. The thrust of the article is a trident. The movant (i) engaged in unethical fee charging practices, (ii) offered to "fix" a case, and (iii) offered to bribe a judge. A priest privileged to serve in the temple of justice is charged with its desecration. The copy is defamatory as a matter of law.

It is an ancient rule that authors and publishers may not repeat false and defamatory matter and escape liability with the plea that they were but quoting a source deemed authentic. *Evans v. Smith*, 21 Ky. 363, 5 T.B.Mon. 363 (1827); *Gearhart v. WSAZ, Inc.*, D.C. Ky., 150 F.Supp. 98 (1957). They are not saved by accompanying the defamation with an expression of disbelief. The respondents submit that we should recognize an absolute constitutional privilege of "neutral reportage." The doctrine provides that the media are privileged to make reports of newsworthy charges even if they doubt their truth so long as they reasonably and in good faith believe that the charges are accurately conveyed. *Edwards v. National Audubon Society*, C.A. 2, 556 F.2d 113, 120 (1977), cert. denied, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). There are at least two flaws in this diamond: (i) the courts that have recognized the doctrine have limited its application to statements about public figures and public officers, *Ed-*

*wards*, supra; *Dixson v. Newsweek, Inc.*, C.A. 10, 562 F.2d 626, 631 (1977), and movant, as we will hereinafter demonstrate, is a private person, and (ii) the constitution does not require the recognition of such a privilege, *Dickey v. CBS, Inc.*, C.A. 3, 583 F.2d 1221, 1225 (1978).

The penultimate conclusion is that this case should have been submitted to a jury. The ultimate question is by what standard should the jury decide the case.

*Gertz*, supra, and its phylogeny sound the death knell of the doctrine of liability without fault in libel cases against media defendants. If the plaintiff is a public official or a public figure, he may recover only on clear and convincing proof of actual malice on the part of the defendant. Actual malice is established by showing that publication was made either with knowledge of the falsity of the defamation or with reckless disregard for the truth. If the plaintiff is a private person, the states are left free to adopt any rule of liability short of liability without fault.

The next determination that must be made is whether the movant is a public figure or a private person. We are satisfied that the movant is a private person because: (i) he is not a public official, (ii) the article was unrelated to prior coverage of the movant and was prompted by an independent investigation by the newspaper, (iii) he did not voluntarily thrust himself into the forefront of any particular public controversy in order to influence the resolution of the issues involved, and (iv) he had no regular and continuing access to the media for remedial self-help to rebut false defamatory factual allegations. *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *Wolston v. Readers Digest Assoc., Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); *Gertz*, supra.

Section 8 of the Kentucky Constitution provides in part:

"Every person may freely and fully speak, write and print on any subject,

being responsible for the abuse of that liberty."

Each of our four constitutions have qualified freedom of speech and press by responsibility for abuse of these liberties. Clearly, these provisions were not intended to grant greater protection than the First Amendment to the federal constitution which antedated our first constitution adopted in 1792 by only four months. Other states with similar constitutional provisions have found that the simple negligence standard is most compatible with their history and stated public policy. *Martin v. Griffin Television, Inc.*, Okl., 549 P.2d 85, 92 (1976); *Gobin v. Globe Publishing Co.*, 216 Kan. 223, 232, 531 P.2d 76, 83 (1975); *Troman v. Wood*, 62 Ill.2d 184, 194–95, 340 N.E.2d 292, 297 (1975). We are persuaded to join their company.

The negligence test may be broadly restated as permitting recovery on a showing that in publishing a defamatory falsehood the defendant knew, or in the exercise of reasonable care should have known, that the statement was false or would create a false impression in some material respect. *Taskett v. King Broadcasting Co.*, 86 Wash.2d 439, 445, 546 P.2d 81, 85 (1976); *Thomas H. Maloney & Sons, Inc. v. E. W. Scripps Co.*, 43 Ohio App.2d 105, 110, 334 N.E.2d 494, 498 (1974), cert. denied, 423 U.S. 883, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975). The conduct of the defendant is to be measured against what a reasonably prudent person would, or would not, have done under the same or similar circumstances. This is the ordinary negligence test that we adopt, not a "journalistic malpractice" test which bases liability upon a departure from supposed standards of care set by the publishers themselves. *Memphis Publishing Co. v. Nichois*, Tenn., 569 S.W.2d 412 (1978); *Taskett*, supra; *Troman*, supra.

We are convinced that *Gertz* and its phylogeny impose the burden of proof and risk of non-persuasion on the issue of falsity of the defamatory statement on the plaintiff. *Wilson v. Scripps-Howard Broadcasting Co.*, C.A. 6, 642 F.2d 371 (1981). *Gertz* and its

progeny preclude the award of either punitive or "presumed" damages unless the "actual malice" standard is met. If this standard is not met, recovery is limited to "actual injury," loosely defined as impairment of reputation, loss of standing in the community, personal humiliation, mental suffering and economic loss. *Time, Inc. v. Firestone*, supra.

We are not favorably impressed by the other assignments of error made by the movant.

The decision of the Court of Appeals and the judgment of the Jefferson Circuit Court are reversed, and the cause is remanded to the trial court for further proceedings consistent herewith.