RENDERED: SEPTEMBER 22, 2016
TO BE PUBLISHED

# Supreme Court of Kentucky

2015-SC-000408-MR

JOHN DOE, NO. 1;
AND JOHN DOE, NO. 2                                    APPELLANTS

ON APPEAL FROM COURT OF APPEALS
V.             CASE NO. 2015-CA-000221-OA
PIKE CIRCUIT COURT NO. 13-CI-01145

HONORABLE EDDY COLEMAN,
JUDGE, PIKE CIRCUIT COURT                                APPELLEE

AND

WILLIAM HICKMAN, III                          REAL PARTY IN INTEREST

**OPINION OF THE COURT BY JUSTICE NOBLE**

**REVERSING AND REMANDING**

This case presents the question what must a public-figure prove to obtain the identities of anonymous speakers alleged to have defamed him.

**I. Background**

Appellee William Hickman filed an action in Pike Circuit Court on October 18, 2013 against several anonymous users of the website Topix (hereafter the John Does) claiming that the John Does had posted defamatory statements about him on the website. Hickman claimed that the various statements, which he attached in a transcript, were recklessly published by the John Does. Specifically, his complaint stated that the statements "perpetuated substantial errors and omissions that wrongfully and erroneously imputed

fraud, dishonesty, criminal activity and conduct incompatible with his business, trade, profession and office" about him and thereby damaged his reputation.

Because he did not know the identity of the John Does, Hickman issued subpoenas to Topix and another internet provider seeking the identity and address of John Doe 1 and John Doe 2. The providers did not respond, but the two John Does filed a motion to quash the subpoenas. The trial court, Appellee Judge Coleman, denied the motion to quash, which led to the filing of a petition for a writ of prohibition with the Court of Appeals.

In an attempt to balance the John Does' First Amendment right to anonymous speech and Hickman's right to seek redress for defamatory speech, the Court of Appeals purported to apply *Dendrite International, Inc. v. Doe No. 3,* 775 A2d 756 (N.J. Supp. Ct. App. Div. 2001), as modified by *Doe v. Cahill,* 884 A.2d 451 (Del. 2005). To some extent, this description of the relationship between the two cases is not accurate: *Dendrite* cannot have been modified by *Cahill,* as they are from different court systems. In reality, the Court of Appeals applied *Cahill,* which applied a modified version of the rule announced in *Dendrite.*

*Dendrite* required that in order to compel the identity of a John Doe, a plaintiff must (1) take reasonable steps to notify the John Doe of the subpoena and allow the John Doe opportunity to respond; (2) identify and set forth the exact statements alleged to be actionable speech; and (3) establish that the plaintiff's case can withstand a motion to dismiss for failure to state a claim *and* produce sufficient evidence on each element of the claim on a *prima facie*

2

basis. Finally, if the plaintiff establishes a *prima facie* case for defamation, then (4) the court must balance the First Amendment right of free speech against the *prima facie* evidence and the necessity for disclosure in order to proceed.

However, the Court of Appeals actually followed the holding in *Cahill*, which concluded that under Delaware law, two of the specifics of the *Dendrite* holding were subsumed under that state's summary judgment standard. Instead of the four-step *Dendrite* approach, *Cahill* outlined a two-step process of (1) giving notice and opportunity to be heard and (2) making a *prima facie* showing sufficient to defeat a summary judgment motion.

And because of the additional factor of anonymous public speakers, the Court of Appeals also adopted *Cahill*'s reasoning that the final element of public-official defamation—actual malice—did not have to be a part of a *prima facie* showing. The exclusion of establishing the knowledge or reckless-disregard portion of a defamation claim against a public figure, the Court of Appeals held, was appropriate at that time because that element could only be proved after the identities were revealed, which was the point of the subpoena.

Thus, in order to *obtain* the identities of the John Does, the Court of Appeals required Hickman to attempt to notify the John Does that he was seeking their identity and give them opportunity to respond, and then make a *prima facie* showing that defamation had occurred under *Cahill*. On that note, the Court of Appeals granted a writ of prohibition as to the existing discovery order and sent the case back to circuit court to apply this new rule. Although that decision was appealable to this Court as a matter of right, no appeal was taken.

Back at the circuit court, Hickman sought to prove his *prima facie* case since the first prong of the Court of Appeals ruling had obviously been met: the John Does had entered an anonymous appearance in the court, and had had time to respond to the subpoenas. Hickman offered an affidavit claiming falsity and attaching 14 pages of individual Topix posts. The affidavit did not address individual posts, but instead claimed that the posts collectively accused him of "a pre-planned conspiracy to violate Federal and State Statutes to illegally take property and money from the Pikeville/Pike County Airport Board for personal gain and for the personal gain of other individuals." Without refuting any of the specific statements, Hickman merely summarized "this is not true and is totally baseless." He further characterized the statements as saying he was "dishonest, a thief, an embezzler and otherwise a criminal," which he also said was "not true" and "totally baseless." He repeated several times in his affidavit that all the statements were "not true" and facially defamatory. Finally, he asserted that audits had confirmed that "no accounting crimes" had been committed regarding the airport funds.

The John Does argued that the specific language in the statements simply did not contain facially defamatory statements and that there had been inadequate proof that any of the statements alleged to be defamatory were false.

The Pike Circuit Court ordered each side to submit a proposed order reflecting the view each had argued. Hickman did so, but also included relief that had not been previously requested or argued: that counsel for the John Does be required to disclose their identity. The John Does proposed a counter-

order addressing their arguments, and raising SCR 3.130(1.6) as authority that a lawyer could not reveal confidential client information absent consent of the client without court order, and without informing the client of the right to appeal such order.

The court accepted Hickman's order as proposed, ordered subpoenas to be served, and ordered counsel for the John Does to disclose their identities and to specify which of the posts had been made by each of them. The John Does filed another writ petition in the Court of Appeals. The court denied the petition this time, concluding that Hickman had satisfied the standard articulated in its previous opinion by making a *prima facie* case, including providing evidence that the statements were false.

This time, the John Does filed their matter of right appeal to this Court.

## II. Analysis

Generally speaking, cases in which a writ of prohibition or mandamus is sought proceed in two steps. *Collins v. Braden*, 384 S.W.3d 154, 158 (Ky. 2012). First, the court must look at whether such an extraordinary remedy is even available, before deciding the merits of the claimed legal error. *Id.* Second, if the court finds that the remedy is available, it may then look at the merits of the claimed error. *Id.* If the trial court has erred or is about to err, the court may issue the writ.

### A. The remedy of a writ of prohibition is available to the John Does.

The first question is whether the John Does have "established that remedy by way of an extraordinary writ is even available to [them]." *Id.* Under this approach, there are essentially "two classes of writs, one addressing claims

5

that the lower court is proceeding without subject matter jurisdiction and one addressing claims of mere legal error." *Id.* at 158. The John Does have not made a claim under the first class, and thus we address only the second.

Under the second class, a writ *may* be granted—that is, the remedy is available—if "there exists no adequate remedy by appeal or otherwise and great injustice and irreparable injury will result if the petition is not granted." *Hoskins v. Maricle,* 150 S.W.3d 1, 10 (Ky. 2004). Of the two prerequisites for this class of writ, the first is mandatory, and thus the John Does are required to prove that they have no adequate remedy by appeal. *Marcum v. Scorsone,* 457 S.W.3d 710, 716 (Ky. 2015). The second prerequisite, however, is more flexible. Though it usually requires proof of "something of a ruinous nature," it "may be put aside in *'certain special cases.'*" *Grange Mut. Ins. Co. v. Trude,* 151 S.W.3d 803, 808 (Ky. 2004) (quoting *Bender v. Eaton,* 343 S.W.2d 799, 801 (Ky. 1961)). That limited sub-class of cases consists of those in which "a substantial miscarriage of justice will result if the lower court is proceeding erroneously, and correction of the error is necessary and appropriate in the interest of orderly judicial administration." *Id.* (quoting *Bender,* 343 S.W.3d at 801). This includes those cases in which a privilege will be breached. *Id.*

Whether there is a privilege is at issue in two ways in this case. First, because anonymous speech is protected under the First Amendment, *Buckley v. Am. Constitutional Law Found., Inc.,* 525 U.S. 182, 197–99 (1999); *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334 (1995), the speaker's identity is generally protected and not subject to forced revelation in court. Second, the trial court

6

ordered the John Does' attorney to disclose their identities, which the John Does claim violates their attorney-client privilege.

Generally speaking, an alleged violation of a privilege or similar protection satisfies both writ prerequisites—that "of no adequate remedy by appeal, 'because privileged information cannot be recalled once it has been disclosed,' and the substitute requirement in 'special cases' that the administration of justice would suffer." *Collins,* 384 S.W.3d at 158. For that reason, "remedy by a writ of prohibition is available to a petitioner claiming the potential violation of a privilege." *Id.* Indeed, we have specifically held that the remedy is available to remedy improperly ordered discovery of information claimed to be protected under the First Amendment in a libel case. *Lexington Herald-Leader Co. v. Beard,* 690 S.W.2d 374, 377 (Ky. 1984). Thus, a writ is available as a remedy in this case if the John Does can demonstrate error by the trial court.

## B. Hickman has not made a sufficient showing at this time to overcome the John Does' First Amendment interest in protecting their identities.

Here, the Court of Appeals found that issuance of a writ of prohibition was not appropriate because the trial court had properly applied what it viewed as the *Dendrite/Cahill* test. That test, as the Court of Appeals stated it in the first writ action, required a two-prong analysis: (1) the anonymous speaker must be given notice and opportunity to be heard, and (2) the plaintiff must make a *prima facie* case for defamation under the summary judgment standard set forth in Justice Keller's partially concurring opinion in *Welch v. American Publishing Co. of Kentucky,* 3 S.W.3d 724, 731–32 (Ky. 1999), to the extent

7

those elements are under his control. Except for the addition from *Welch*, the test set by the Court of Appeals mirrors the two-step process of *Cahill* rather than the four-step process of *Dendrite*.

For the most part, the standard set forth in Justice Keller's opinion was the ordinary summary judgment standard: if the alleged defamatory speakers wanted to get summary judgment against the *plaintiff* in that case, they would have to show that it was impossible for the plaintiff to produce sufficient evidence at trial to prevail. *Id.* at 731 (Keller, J., concurring in part and dissenting in part). But his opinion suggested as to *falsity* that a bare denial by the plaintiff of the truth of the statements would suffice to defeat the speaker's summary judgment motion. *See id.* (noting that the plaintiff "denied the truth of many of the allegations"). The upshot of using the summary judgment language from *Cahill* and an inaccurate view of the required evidence to prove falsity adequate to pass a summary judgment motion resulted in a standard not supported by either *Dendrite* or *Cahill*.

However, because no appeal was taken from the previous Court of Appeals ruling, *Dendrite* and *Cahill*, as funneled through the partially concurring opinion in *Welch*, are the law the trial court applied to this case. Indeed, this Court agrees that *Dendrite* and *Cahill* are the appropriate authority because they adequately protect the John Does' First Amendment rights. But the directive from the Court of Appeals cannot fit within that protective law because the partly concurring opinion in *Welch* does not articulate the appropriate showing of falsity. And, as set forth herein, the four-step analysis

8

of *Dendrite* is clear in defining the required *prima facie* showing, and requires no "summary judgment" analysis.

Thus, while *Dendrite* and *Cahill* remain the "law of the case," this Court recognizes that the doctrine is "prudential in nature and serves to direct a court's decision, not limit its power." *Wright v. Carroll*, 452 S.W.3d 127, 130 (Ky. 2014). This Court thus "may deviate from the doctrine if a previous decision was 'clearly erroneous and would work a manifest injustice.'" *Id.* (quoting *Brown v. Commonwealth*, 313 S.W.3d 577, 610 (Ky. 2010)).

Thus, part of the Court of Appeals' test is clearly erroneous, but the reasoning expressed in *Dendrite* and *Cahill* is correct, and we hold that the appropriate test is the four-step process outlined in *Dendrite*, as supported by the analysis in *Cahill*. As the Court of Appeals correctly noted, we must "strike a balance between the First Amendment right to anonymous speech and the right of those harmed by anonymous speech to seek legal redress." The four steps of *Dendrite* provide the best process to strike that balance.

Similar to the present case, the plaintiff in *Dendrite*, a corporation, brought a defamation action against John Doe defendants for posting a message on an internet service provider's bulletin board. But *Dendrite*, as well as this case, was not really an "internet" case, though there was much discussion about the effect of the internet. There, as here, the internet was simply the vehicle for posting the anonymous statements that the corporation viewed as defamatory. Claiming that the posted comments were "categorically false," *Dendrite*, 775 A.2d at 763, the corporation requested expedited discovery disclosing the identity of the John Does.

9

The trial court in *Dendrite* recognized that the usual deference given to discovery requests did not apply when the speech in question was being exercised anonymously. Instead, it attempted to "balance an individual's right to anonymously voice their opinions against a plaintiff's right to confront their accusers." *Id.* at 764. Concluding that the corporation had failed to show that it was harmed by any of the posted messages and that the John Does had not acted under their free-speech rights unlawfully so as to revoke their protections, the trial court denied the discovery request. *Id.*

On appeal, the New Jersey Superior Court found that the trial court was correct, and established a four-step process in cases involving protected anonymous speech: (1) the plaintiff must make reasonable efforts to notify the anonymous speakers that their identity is being sought, and give them a reasonable opportunity to object; (2) the plaintiff must identify and set forth the exact alleged defamatory statements; (3) the court must carefully review the entire record to determine whether the plaintiff has stated a *prima facie* cause of action sufficient to withstand a motion to dismiss for failure to state a claim *and, in addition,* whether the plaintiff produced sufficient evidence supporting each element of the cause of action; and (4) the court must balance the anonymous free speech rights against the strength of the *prima facie* case presented. *Id.* at 767–68.

*Dendrite* was subsequently followed by the Supreme Court of Delaware in *Cahill.* However, that court condensed the *Dendrite* factors to only two: (1) the plaintiff must undertake to notify the John Does that their identity is being sought and give them the opportunity to object; and (2) the plaintiff must

support his defamation claim with facts sufficient to defeat a summary-judgment motion. That court reasoned that the separate steps of the *Dendrite* test were actually subsumed in the summary-judgment analysis under Delaware law. In other words, if the plaintiff could survive a theoretical summary judgment motion, then the plaintiff was entitled to the identities of the anonymous speakers. As the discussion throughout the case indicates, however, that assumption was based on applying the *Dendrite* factors. Calling this making a case sufficient to pass summary judgment, however, can be misleading when other states attempt to apply the *Cahill* holding. This is where the Court of Appeals went astray in using the summary-judgment term and looking for an example in another Kentucky defamation case.

First, summary-judgment standards vary significantly from state to state and in comparison to the federal standard. In Kentucky, the non-moving party's evidence must be taken as true. To prevail, the moving party must show that it is all but impossible that the non-moving party could prevail at trial before summary judgment can be granted. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 479, 483 (Ky. 1991).

Second, as the *Cahill* court describes the process, a plaintiff attempting to obtain the identity of an anonymous speaker must anticipate how he would refute a motion for summary judgment filed against him, and that is the type of proof that he must produce as his *prima facie* evidence in order to persuade the court to grant discovery of the identity of the anonymous speaker. And, as that court pointed out, the standard is more stringent than a motion to dismiss or good-faith standard. Despite using the term summary judgment, for whatever

11

it means in Delaware, the court in *Cahill* acknowledged that a plaintiff seeking the identity of an anonymous speaker had to produce factual evidence to support his motion to obtain the identities.

When the Kentucky summary-judgment standard as laid out by the partial concurrence in *Welch* is brought to play, it simply does not sync with the analysis in *Dendrite* and *Cahill*. Thus when the trial court applied the Kentucky summary-judgment standard below, it was in error, albeit following the literal language of the Court of Appeals' remand. To avoid any such confusion, we need simply apply the four steps of *Dendrite*.

It is significant, in determining what is necessary for a plaintiff to produce in order to make a *prima facie* case sufficient to breach the protected anonymity of a John Doe, to note that *Dendrite* requires factual evidence about each element of the defamation claim. This is particularly true as to the element of falsity.

In order for Hickman to breach the John Does' anonymity, he must make a *prima facie* case of facially defamatory statements, that are in fact *false*, through *supporting facts* under the reasoning of *Cahill* and the specific language of *Dendrite*.

This approach is fitting considering the nature of the interests at issue: a speaker's right to comment anonymously about matters of public interest or a public official's actions in regard thereto, versus a citizen's right to redress for harm caused by defamatory speech. This approach is necessary to "strike a balance" between these competing interests. Thus we have adopted the more specific analysis in *Dendrite* rather than the two-prong test of *Cahill*. And in

12

order to meet that standard, supporting facts are necessary to confirm a claim of falsity.[1]

There is little question now that the mere allegation of the falsity of a statement will not be sufficient. For example, in the context of a claim of qualified privilege to make otherwise defamatory remarks, "the mere allegation of falsity" is no longer sufficient "to permit an inference of malice." *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 287 (Ky. 2014). Instead, malice, like falsity, "must be shown." *Id.* It stands to reason that if a mere allegation of falsity cannot show malice, it also cannot show falsity. Stating "that's not true" is substantially different from offering evidence showing how "that" is not true. The former is merely a characterization; the latter is a refutation, or at least the beginning of one.

And it is certainly true that "free speech" is one of the most sacrosanct of freedoms, and one which is at the heart of defining what it means to be a free citizen. The First Amendment of the United States Constitution guarantees this freedom. And "political speech directed toward public officials is at the pinnacle of protected speech." *Welch v. American Publishing Co. of Kentucky*, 3 S.W.3d

---

[1] It should be noted that the dicta and holding in *Cahill* make it clear that the court believed it was doing a *Dendrite* analysis:

> Another court has addressed this issue and reached the same conclusion. In *Dendrite Intl., Inc. v. Doe*, an intermediate New Jersey appellate court adopted a standard more stringent than either the motion to dismiss or the good faith standard. ... We accordingly hold that before a defamation plaintiff can obtain the identity of an anonymous defendant through the compulsory discovery process he must support his defamation claim with *facts* sufficient to defeat a summary judgment motion.

*Cahill*, 884 A.2d at 459–60 (emphasis added, footnote omitted).

724, 726 (Ky. 1999). Without free comment on matters of public concern, totalitarianism can arise. And naturally, when public speech is "free," that speech will contain comments critical of those who seek to govern. Indeed, it is inherent in a democracy that only by exercising one's voice can the individual citizen truly participate in the governance of society. Sometimes, negative things just need to be said.

To that end, the U.S. Supreme Court has held that *anonymous* public speech is also protected. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995). Obviously, the importance of unfettered public speech is so great that the benefit of such speech generally outweighs knowing *who* is making the statement. That is true even when the speech occurs on the internet instead of the common sources of the past, since internet speech stands on an equal footing with any other speech. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997).

Nonetheless, this freedom of speech is not without limit. There is no protection for speech that is obscene, *Miller v. California*, 413 U.S. 15, 23 (1973), or defamatory, *New York Times Co. v. Sullivan*, 376 U.S. 254, 268 (1964). Here, Hickman claims that the anonymous speech at issue is defamatory and false and that, as such, the identity of the person making the internet comments is not protected. To find redress for this alleged defamatory speech, he claims he must know who the speakers are, particularly to prove the malice prong of his defamation claim.

As with any defamation claim against a public official, Hickman must establish that statements have been made that hold him up to public hatred,

14

contempt or ridicule, or that caused him to be shunned or avoided, or that injured him in his business or occupation; that the statements are false; and that the statements were made with actual malice. *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 884 (Ky. 1981). And, in this particular case, he must also contend with the nature of the speech as protected, anonymous public comment.

As the Court of Appeals noted, the United States Supreme Court has not yet addressed the parameters for discovering the identity of an anonymous public speaker, so that question at present has been left to the states. The Court of Appeals in the first writ case thus adopted the two-prong test in *Cahill* set forth above, which is correct only when it is viewed as encompassing the specifics of *Dendrite*. But, the Court of Appeals also included another detail: the elements of the *prima facie* defamation claim must be shown only to the extent that they are within the control of the plaintiff. And when the plaintiff is a public official, unless actual malice can be inferred from the statements themselves, *cf. Welch*, 3 S.W.3d at 736 (Cooper, J., dissenting) (noting that patent falsity of statement can be circumstantial evidence of malice), then it may be impossible to prove actual malice until the identity of the John Does is revealed. That is clearly beyond the control of the plaintiff at that point.

It should be noted that *Dendrite* did not involve a public official, although *Cahill* did involve an elected town council member. In explaining how a *prima facie* case could be made by a public defamation plaintiff, the *Cahill* court addressed the elements of a defamation libel claim and what proof must be shown for each element under Delaware defamation law. That law differs

15

somewhat from the elements required to prove defamation and damages in Kentucky, but it does also contain the requirement that a public figure must show that a defendant made the statement with actual malice. The *Cahill* court, however, specifically found that it was *not* requiring a public figure defamation plaintiff to prove the statements were made with actual malice, because at that point, not knowing the identity of the John Does, that element was not within the plaintiff's control. Our Court of Appeals simply made this discussion part of the test. Such is clearly logical at this stage of the proceeding.

But one thing the *Cahill* court did in describing how a *prima facie* case can be shown by a plaintiff was to point out that as to the element of falsity, a defamation plaintiff can offer "his own *factually based averment* that the statements are false." 884 A.2d at 464 (emphasis added). In short, while the plaintiff does not have to offer evidence of actual malice at this point, the trial court must determine that the statements are in fact defamatory, and the plaintiff does have to present a factual basis upon which falseness can be established. A bare denial is not sufficient, but rather some facts supporting falsity must be put before the court. Clearly, because of the protected nature of anonymous public speech, the degree of proof necessary to be sufficient to pass review here is greater than when considering discovery that does not involve constitutionally protected conduct.

Applying the *Dendrite* test to this case, the first prong has already been met. It appears that sufficient notice was given, as the John Does were able to engage counsel, who appeared on their behalf to challenge the discovery of

16

their identities. And the alleged defamatory statements have been listed with particularity. It is the third and fourth prongs from *Dendrite* that require a more difficult analysis.

First, we must determine if the statements submitted to the court were in fact defamatory. A series of posts on Topix, apparently by the John Does, clearly takes issue with Hickman's role as chairman of the airport board. Some of the statements are opinion, others contain innuendo, but some actually make apparently factual statements that accuse Hickman of being in the control of "little Frankie" and "Senator Ray Jones." Many of the comments consist of the anonymous speaker saying what he thinks of Hickman's character and abilities. As such, these are purely opinion, even though hurtful. But Hickman is also accused of at least three potential illegalities in his public role as chairman of the airport board: (1) improperly helping "Little Frankie" obtain a parcel of land that the previous board would not sell him; (2) improperly obtaining a new or favorably located hangar for himself and Senator Jones; and (3) improperly squandering an $8 million budget on useless projects such as pursuing a connection with a regional airline, fixing a "dip" in the runway, and paying for unneeded services. In short, he is accused of official misconduct or malfeasance in office, and the statements are obviously defamatory. Other than obtaining a good hangar for his plane, however, the comments do not accuse Hickman of personally benefiting from his actions.

The overall tone of the comments collectively is scathing. And Hickman's response to the comments is understandable. But if the comments are protected public criticism of a public official, the nature of the comments is not

the point of legal scrutiny. Rather, the question is whether the comments are false, and eventually whether they were made with actual malice. In order to require disclosure of the identity of the John Does, as a part of his required *prima facie* showing, Hickman must offer real evidence that the strident complaints against him are *false.*

Hickman's proof of falsity so far consists of two things: he says the statements are "not true" and "totally baseless," and that an audit did not disclose any "accounting crimes" in the airport board's business.

The allegedly libelous statements cannot be *presumed* to be either false or true when a plaintiff seeks to invade the anonymity of a public speaker. The burden is on Hickman to make a *prima facie* showing that they are false. He must meet "a standard more stringent" than simply restating that the statements made about him were false as he did in his affidavit. Hickman cannot simply deny that the statements are true and thus pierce anonymity.

Under that perspective, it cannot be said that Hickman has adequately proved that the claims of malfeasance or official misconduct are false. A bare denial does not suffice. And the fact that an audit did not turn up "accounting crimes" does not, standing alone, establish that Hickman did not improperly favor "Little Frankie," improperly obtain a favorable hangar for himself, or improperly spend the airport budget. An audit simply does not guarantee that this kind of claim has been examined.

As the court in *Cahill* pointed out, some specific proof is necessary to invade the anonymity of a critic. Here, Hickman could address the expenditure claims or outright dispute that he got a favorable hangar by showing that he

18

got his spot through the normal process or that it was not actually all that favorable, or that someone else was the decision maker regarding expenditures and land sales, or any manner of other factual reasons why the allegations are false. And certainly, if Hickman cannot produce some factual evidence that the statements are false at this point, how would he be able to prove actual malice by clear and convincing evidence, which is what our law requires? *See Warford v. Lexington Herald-Leader Co.*, 789 S.W.2d 758, 771 (Ky. 1990). As the majority stated in *Welch*, "This higher proof requirement for public figures is based upon the premise that unfettered political discussion is a necessary and fundamental principle of our constitutional system of government, assuring that political decisions will be made through persuasion rather than power." *Welch*, 3 S.W.3d at 728 (citing *New York Times Co. v. Sullivan*, 376 U.S. at 269–270).

Simply put, factual evidence of all the elements of a defamation claim that are within the control of the plaintiff must be shown before a court may pull aside the shroud of anonymity enjoyed by a public critic in instances like the Topix posts. Because Hickman has not yet made a *prima facie* case sufficient to substantiate the falsity of the statements, he should not be allowed to obtain the John Does' identities at this point in the proceeding, and the Court of Appeals should have issued the writ.

And, certainly if the trial court had applied the fourth prong of *Dendrite*, of further balancing of the right to anonymity against the strength of the *prima facie* case and the necessity for disclosure, the strength of bare denials could not have outweighed the protected right of anonymity. Because of the

19

importance, and thus protected nature, of anonymous public speech, even after a *prima facie* showing has been made in such cases, the court must still balance whether the overall extent of the defamation is so great that it outweighs the protection of the anonymous public speech before ordering the identities disclosed. That step was not reached by the court here, but may require future analysis if the case proceeds further.

## C. The trial court cannot enforce an order for an attorney to disclose identities of clients at this stage in this litigation.

Having determined that the clients' identities remain protected by the First Amendment, this case raises another issue: namely, whether the lawyer can be required to disclose the identities at this stage of the litigation. The John Does maintain that their names are privileged from disclosure under KRE 503 (attorney-client privilege).[2]

The identity of a client is normally not a privileged communication. *Hughes v. Meade*, 453 S.W2d 538, 540 (Ky. 1970); *see also* Evidence Rules Study Committee, *Kentucky Rules of Evidence*, Final Draft 42 (Nov. 1989) (commenting that "[c]lient identity ... [is not] generally within the privilege"). That "information is not usually intended to be confidential, and in most instances, the client's name or identity is not one of the facts about which the client seeks legal advice." Paul C. Giannelli, *Understanding Evidence* 592 (3d

---

[2] "A client has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client ... [b]etween the client ... and the client's lawyer." KRE 503(b)(1). "A communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." KRE 503(a)(5).

20

ed. 2000). That being said, "[t]his general rule ... is subject to exception under unusual circumstances." *Hughes*, 453 S.W.2d at 541.

The limited exception to the general rule that has developed in the federal and state courts typically involves inquiring "whether an order to disclose identity ... would have the effect of revealing intertwined confidential communications between client and lawyer." Robert G. Lawson, *Kentucky Evidence Law Handbook* §5.05[5][b], at 354 (5th ed. 2013). "[T]he correct test is whether the fee-payer's identity ... [is] so intertwined with confidential communications that revealing ... the identity ... would be tantamount to revealing a privileged communication." *Ralls v. United States*, 52 F.3d 223, 226 (9th Cir. 1995). Absent such circumstances, it would not further the purpose of the attorney-client privilege—encouraging a client's full disclosure of facts to facilitate effective legal advice or advocacy, *see, e.g.*, Lawson, *supra*, § 5.05[1][a], at 342—to allow the identity of clients to be privileged. Allowing a broader exception would be inconsistent with the rule of strict construction, *see Haney v. Yates*, 40 S.W.3d 352, 355 (Ky. 2000), which constrains the privilege's reach to the rationale and purpose it is meant to serve.

Here, the attorney's disclosure of the clients' names would not reveal any other such privileged communications, such as their motive for seeking legal advice and representation. *Cf. Baird v. Keorner*, 279 F.2d 623 (9th Cir. 1960) (sustained claim of privilege for lawyer who made payments to IRS on behalf of clients where revealing their identities would have disclosed confidential communications, such as their concern about past underpayments of taxes). It follows that the attorney-client privilege would not shield the identities from

21

court-ordered disclosure by the attorney where the clients have no right to remain anonymous.[3]

Of course, the very reason the clients sought legal representation was to protect their anonymity. Obviously, the clients communicated their identities to their lawyer with the intent that they remain confidential, but that is true only insofar as such confidentiality is protected under the law. It is the First Amendment that limits the court's ability to order disclosure of their identities. Their intent that their identities remain confidential does not control if the law does not protect their anonymity.

To put it another way, at this point in the litigation, rather than as mere client identities in the general sense contemplated above, the clients' names are more accurately considered to be material facts at issue. That is, whether the clients have a right under the First Amendment for their Topix posts to remain anonymous, and thus their identities to remain undisclosed, is disputed. Therefore, their identities are "facts" that they communicated to their lawyer in confidence for the purpose of receiving legal services—to defend their anonymity and, more broadly, to defend them against Hickman's allegations of

---

[3] We also note in passing the claim made by the John Does' attorney at oral argument that he would necessarily be committing an ethical violation by complying with a court order to disclose his clients' identities. The rule of professional responsibility governing maintaining a client's confidences is SCR 3.130-1.6, which provides "[a] lawyer may not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation *or the disclosure is permitted by paragraph (b).*" SCR 3.130-1.6(a) (emphasis added). Among other things, paragraph (b) allows a lawyer to reveal what would otherwise be confidential information to the extent necessary "to comply with other law *or a court order.*" SCR 3.130-1.6(b)(4) (emphasis added). The rule thus provides a safe harbor of sorts for attorneys ordered by a court to reveal confidential information.

libel. Those facts remain privileged so long as the purpose for their being confidential (the asserted right to anonymity) remains viable.

However, once the viability of that purpose ceases—that is, once it is established that the First Amendment does not protect their anonymous speech because an adequate *prima facie* showing of defamation has been made as discussed above—the identities' status changes. The clients' names are then no longer material facts in the sense explained above, but instead revert to the ordinary sense of "client identity" not protected by the privilege.

If it is established that they do not in fact have a right to remain anonymous because a sufficient initial showing that their speech was libelous has been made to defeat that right, the confidential nature of their identities evaporates. At that point, the general rule that client identity is not privileged comes into play, and since the limited exception explained above is not implicated by the circumstances here, the attorney-client privilege would not bar the court from ordering the attorney to reveal his clients' names. Under the circumstances of this case, there is no reason to broaden the exception to the general rule that a client's identity is not a privileged communication under KRE 503.

In sum, once it has been established through making the required *prima facie* showing discussed above that the First Amendment does not shield the identities of the anonymous-speaker clients from being disclosed, the attorney can be ordered to divulge the identities of his clients, but not their confidential communications to him.

23

### III. Conclusion

At this point, Hickman has not made an adequate *prima facie* case of the elements of defamation that are under his control to allow him to obtain the John Does' identities. Specifically, he has not made a *factually based averment* that the statements are false and has, instead, merely characterized them as false. That is not enough. For that reason, the order of the Court of Appeals denying the petition for a writ of prohibition is reversed, and this matter is remanded to that court to issue the writ. Further proceedings at the trial court shall proceed under the standards articulated in this opinion.

All sitting. Minton, C.J.; Hughes and Keller, JJ., concur. Venters, J., concurs in result by separate opinion. Cunningham, J., dissents by separate opinion in which Wright, J., joins.

VENTERS, J., CONCURRING IN RESULT ONLY: I concur in the result reached by the majority but, I disagree with its reasoning. The majority holds that to sustain his claim of defamation and obtain the true names of the offending parties, Hickman must establish a prima facie case supported by what the majority calls "real evidence" that the derogatory remarks are false. The majority says that Hickman has failed to make a "factually based averment" that the derogatory statements were false, and so his claim must be denied. I disagree because there is no special kind of evidence that must be produced to prove the falseness of alleged defamation. Hickman's own statement saying, in effect, "I swear I did not do any of those bad things they said about me" *is* a "factually based averment," and in many defamation

24

situations, the plaintiff's own denial will be the only proof that exists to show the falsity of the derogatory remarks.

The majority's error on this point flows from an unsound analogy it draws from our decision in *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 286–87 (Ky. 2014). As the majority notes, we held in *Toler* that malice in a defamation case could not be inferred simply from plaintiff's allegation of the falsity of the derogatory words. Instead, malice "must be shown." From that holding, the majority reasons that "[i]f a mere allegation of falsity cannot show malice, it also cannot show falsity." Here is the flaw of that analogy: unlike falsity of the derogatory words, malice dwells in the mind and soul of the defamer, and the victim of the defamation cannot know what lies there. Thus, the victim's mere averment of malice cannot establish the existence of malice; he must present some extrinsic evidence indicative of the defamer's malevolent intent. Unlike malice however, the truth or falsity of the alleged defamation resides in the mind of the victim, and thus the victim knows with absolute certainty if the derogatory statement about him is true or false, and so his own averment on the subject stands as evidence of that fact, even though his mere statement with respect to malice would not.

Ultimately though, Hickman's effort to identify his detractors fails, not because he fails to show they lied about him, but because the things they said about him are simply not within the scope of actionable defamation. Of the numerous insults hurled at Hickman by his secret detractors, the majority finds only three that it regards as actionable. They are:

25

1. That "under Bill Hickman's chairmanship, Little Frankie got exactly what he wanted, and there may be criminal activity involved in the transfer of airport holdings to Little Frankie under the leadership of his PERSONALLY chosen crony Mr. Bill Hickman."

2. "We sat back and allowed Bill Hickman, with Little frankie's [sic] approval, to spend nearly a MILLION dollars of OUR money so they, RAY S. JONES and BILL HICKMAN, could have NEW, side by side, airplane hangars for their personal pleasure and arrogance."

3. A number of different allegations that Hickman and the "mayor justice appointed [airport] board" had "wasted" several million dollars of airport funds.

Only the first of the foregoing statements gets even close to actual defamation: the tepid suggestion that "there may be criminal activity involved" in the transfer of airport property to "Little Frankie." We noted in *Stringer v. Wal-Mart Stores, Inc.*, that when defamation is based upon the imputation of crime, "it is now well-settled that no 'particular act or transaction' sufficient for indictment is required, as long as the 'general terms' 'clearly and unequivocally' impute a 'high crime, such as murder, robbery, or theft.'" 151 S.W.3d 781, 795 (Ky. 2004)[4] (quoting DAVID A. ELDER, KENTUCKY TORT LAW: DEFAMATION AND THE RIGHT OF PRIVACY, § 1.07(C)(1)(b) at 68 (1983). Saying "there may be criminal activity involved in the transfer of airport holdings" does not "clearly and unequivocally impute" a crime, "high" or otherwise, to Hickman.

The other allegations are nothing more than the kind of ubiquitous opinion about waste and mismanagement of public funds that now permeate the cultural

---

[4] *Overruled on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014).

discourse to the point at which they have no real derogatory impact. An expenditure that is in one person's opinion a waste of community's money is to another person a vital investment in the community's future. We may, of course, debate the merits of either opinion but to characterize one as actionable defamation is incorrect and steps on the toes of First Amendment liberties. Therefore, I agree that the Court of Appeals erred by granting the writ of prohibition but I would reverse its decision for the reasons stated above rather than the reasons cited by the majority.

CUNNINGHAM, J., DISSENTING: I respectfully dissent.

The majority presents an overly restrictive requirement that *all* defamation plaintiffs must satisfy in order to receive the most basic discovery information—the identities of the alleged defamers. More precisely, I respectfully submit that the majority's rigid interpretation of the element of falsity is misguided. In so holding, the majority fails to address all of the arguments raised by the anonymous defendants and also fails to address each necessary element of defamation. Because our culture is becoming increasingly saturated by malicious memes and other online chatter, this case presents a novel claim that is likely to have a great impact on the citizens of our Commonwealth. Therefore, a further discussion of all relevant issues is appropriate.

### The Prima Facie Elements of Defamation in Anonymous Speech Cases

"[T]he requisite elements for a defamation claim are: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special

27

harm or the existence of special harm caused by the publication." *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 281-82 (Ky. 2015) (citations omitted).

The first element requires that the communication be a false and defamatory statement concerning another. As to the latter component of this element, the communication must concern the plaintiff. *See Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 273 (Ky. App. 1981). The internet posts at issue here are clearly about Hickman.

A written statement is defamatory if it tends to "(1) bring a person into public hatred, contempt or ridicule; (2) cause him to be shunned or avoided; or (3) injure him in his business or occupation." *McCall v. Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882, 884 (Ky. 1981). Having reviewed all the internet posts, we agree with the trial court, the Court of Appeals and the majority that these communications tend to bring a person into public contempt and would tend to injure a person in their occupation.

However, Appellants argue that the anonymous statements are not actionable because they constitute opinions. *See Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989). Although neglected by the majority, this defense to defamation is relevant at the prima facie stage of litigation.

Protected opinion statements are classified as either "pure" or "mixed" opinions. *Id.* At its foundation, the opinion doctrine depends on what, if any, undisclosed facts were known to either the declarant or the recipient. *Id.* Furthermore, "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, *or if his assessment of them is erroneous*, the statement may still imply a false assertion of fact."

28

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990) (emphasis added). This information is out of Hickman's control.

Requiring Hickman to prove that the statements are actionable non-opinion communications would require him to prove a negative, and to do so without the benefit of discovery. Therefore, this is not an element of Hickman's prima facie case. *Coleman*, 436 S.W.3d at 211-12 (citing *Cahill*, 884 A.2d at 464); *see also* David A. Elder, Defamation: *A Lawyer's Guide*, at § 8.17 (2003) (suggesting that "only the 'clearest cases' should be deemed nonactionable as matter of law . . . .") (citation omitted).

Where I part ways with the majority is on the issue of falsity. Appellants and the majority contest the sufficiency of Hickman's allegations. However, in addition to the allegations pled in the Complaint, Hickman has also submitted an affidavit asserting falsity. *See Cahill*, 884 A.2d at 464 (In order to demonstrate a prima facie case for falsity, "the plaintiff can offer his own factually based averment that the statements are false."). Contrary to the majority's determination, falsity need not be pled with particularity. And although supporting declarations or attestations of falsity are certainly beneficial, such evidence should not be required to establish a prima facie case for defamation. Therefore, Hickman has presented sufficient evidence to establish a prima facie case that the communications are false.

### Remaining Elements

Appellants do not assert that the communications are privileged nor do they deny that the statements were published to a third party. We address this element only to reiterate that publication is a critical component of a prima

29

facie case for defamation. Privilege, however, is not. Like opinion evidence, evidence bearing on the issue of privilege is out of the plaintiff's control in cases involving anonymous defendants. We will next address the element of "fault."

The Court of Appeals correctly observed that Hickman need not prove fault as an element of his prima facie case because it was out of his control. *Coleman*, 436 S.W.3d at 211-12 (citing *Cahill*, 884 A.2d at 464). Similar to the opinion and privilege issues previously discussed, a plaintiff cannot be required to establish evidence of constitutional actual malice without first engaging in discovery. Clearly, that necessitates knowledge of the defendant's identity. We draw additional attention to this "fault" element only to clarify that the level of fault depends on a plaintiff's status as a public or private figure. *See New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (applying actual malice standard in cases involving public officials); *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967) (applying actual malice standard in cases involving public figures); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) (requiring states to adopt a standard of fault in cases involving private plaintiffs).

Kentucky has adopted the simple negligence standard of fault in cases involving private plaintiffs. *McCall*, 623 S.W.2d at 886. In any event, proof of actual malice or negligence necessitates knowledge of the defendant's identity. Therefore, plaintiffs in anonymous speech cases need not prove fault as an element of their prima facie case.

The final element of defamation involves "special harm." As we stated in *Toler*, "[i]f a communication can be labeled per se defamatory, 'recovery is

30

permitted without proof of special damages because injury to reputation is presumed and the words are actionable on their face.'" 458 S.W.3d at 282 (citations omitted). "One example of this per se classification is a communication involving false allegations of unfitness to perform a job . . . ." *Id.* The anonymous internet posts in the present case indicate that Hickman was unfit to perform his job as chair of the Pike County Airport Board of Directors. Several of the posts also imply criminality. 50 Am. Jur. 2d Libel and Slander § 162 (2015). As such, these communications are actionable per se and, therefore, do not require proof of "special harm" under the common law.

However, "[a]lthough special damages need not be proved if the communication is actionable per se, the Constitution is now held by the Supreme Court to require proof of 'actual injury' to the plaintiff, *at least if the defendant did not have knowledge of the falsity of the statement or act in reckless disregard as to its truth.*" Restatement (Second) of Torts § 569 comment c (2015) (emphasis added); *see also id.* at § 621. In the present case, Hickman is a public official and/or public figure and therefore must eventually prove actual malice in order to prevail, i.e. knowledge of falsity or reckless disregard for the truth. As such, he need not prove actual injury. *See* T. Michael Mather, Experience with *Gertz* 'Actual Injury' in Defamation Cases, 38 Baylor L. Rev. 917, 924 (1986) ("Public figures had to prove actual malice, but could then recover traditional presumed and punitive damages. Private plaintiffs had only to prove fault, not actual malice, but were limited in recovery to 'actual injury' if they did not prove actual malice.") (citation omitted). *See*

31

*also Walker v. Kiousis*, 114 Cal. Rptr. 2d 69, 78 (Cal. Ct. App. 2001) (citing 2 Dobbs, The Law of Torts (2001) § 417, p. 1169 ["where public official proves actual malice, *New York Times* rule 'does not require proof of actual harm to reputation.'"], fn. omitted.). In short, "actual injury" is not an element of Hickman's prima facie case.

In First Amendment cases involving private plaintiffs and anonymous defendants, the "actual injury" prima facie requirement may be satisfied by evidence demonstrating economic, emotional, or reputational damage. *Gertz*, 418 U.S. at 349-50. *See also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) (holding that the First Amendment does not require showing of actual malice for recovery of presumed and punitive damages for false statements about private figures involving matters of purely private concern).

In anonymous defamation cases involving public officials, the combination of the common law and the U.S. Supreme Court's First Amendment jurisprudence provides multiple barriers that plaintiffs must traverse in order to obtain relief. At the pre-discovery stage of litigation, the trial court must balance the anonymous free speech rights against the strength of the *prima facie* case presented. *Dendrite Int'l, Inc. v. Doe No. 3*, 775 A.2d 756, 761-62 (N.J. Super Ct. App. Div. 2001). This is a significant hurdle that is absent from non-anonymous defamation cases. And despite the majority's speculation on the matter, balancing these interests is an issue for the trial court.

However, the majority holds that trial courts need not balance these interests if a plaintiff, during the pre-discovery stage of litigation, has failed to argue their case for falsity with mathematical precision fortified by an abundance of evidence. Such a requirement imposes an undue burden on Hickman as well as all other defamation plaintiffs.

In addition, public plaintiffs must eventually prove actual malice by clear and convincing evidence, which is a difficult burden to satisfy. Even private figure plaintiffs must at least demonstrate actual injury. Therefore, the majority's requirement that all defamation plaintiffs in anonymous speech cases must also prove falsity at the pre-discovery stage of litigation imposes yet another barrier to recovery. And for what purpose?

The general absence of defamation cases from court dockets is not a result of an absence of defamation in our society. Much of what is said about public officials is probably defamatory. One need not look any further than the 2016 presidential campaign as a prime example. And since *Milkovich* has essentially abrogated the opinion doctrine, much of what might not have been actionable in the past, may now present a colorable claim.

It is, however, critical to note that the facial evidence presented by Hickman may not be sufficient to overcome subsequent dispositive motions or to establish his proof at trial. Applying a true prima facie standard, however, Hickman should prevail on the narrow issue before this Court as to the identity of John Doe. Therefore, I dissent.

Wright, J., joins.

COUNSEL FOR APPELLANTS:

Lawrence R. Webster
Webster Law Offices
PO Drawer 712
Pikeville, Kentucky 41502


APPELLEE:

Honorable Eddy Coleman
Judge, Pike Circuit Court
Pike County Judicial Center
175 Main Street
Pikeville, Kentucky 41501


COUNSEL FOR REAL PARTY IN INTEREST:

Richard A. Getty
Danielle Brown
The Getty Law Group, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky 40507